In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 07-2330

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSEPH L. GIBSON,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CR 70—**Charles R. Norgle, Sr.,** *Judge.*

_____

ARGUED MAY 8, 2008—DECIDED JUNE 26, 2008

_____

Before MANION, EVANS, and WILLIAMS, *Circuit Judges*.

EVANS, *Circuit Judge.* Following a jury trial, Joseph L. Gibson was convicted of two counts of using a facility of interstate commerce for the commission of murder for hire, in violation of 18 U.S.C. § 1958,[1] one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g), and one count of possession of a firearm with an obliterated serial number, in violation of 18

_____

[1] The counts were based on two cell phone calls on January 27, 2006.

U.S.C. § 922(k). He was sentenced to a total of 235 months in prison. He appeals from his conviction. We start with the facts, viewed in the light most favorable to the jury's verdict.

In 2004, Gibson and a man named Jeff Coleman shared the management and proceeds of a narcotics distribution corner, or "drug spot," near the intersection of Pulaski Road and Adams Street in Chicago. But Coleman got himself arrested and imprisoned, leaving Gibson with complete control of the business. When Coleman was released from prison in January 2005, he reinserted himself into the drug operation.

Tension arose between Coleman and Gibson, and apparently both thought the way to resolve the problem was to have the other killed. In conversations during the summer of 2005 and into early 2006, Gibson talked with a man named Walter Hampton about his belief that Coleman was going to "make a move against him [Gibson]"—meaning that Coleman was going to kill him. Gibson and Hampton discussed killing Coleman. Hampton would do the murder in exchange for a 50 percent share of the profits from the drug spot. Conversations of this nature continued, and in January 2006 Hampton asked Gibson for a "clean" gun to use for the murder. A "clean" gun is one from which the serial number has been removed. Gibson said he had one. Additionally, in January Gibson drove Hampton to the area in which Coleman lived and continued to offer 50 percent of the drug proceeds for the murder.

Having a change of heart, however, on January 25, 2006, Hampton went to the Federal Bureau of Investigation to tell them about Gibson's plan. Agents asked Hampton to place a telephone call to Gibson which they would record.

In the recorded conversation Hampton asked Gibson if he had the "strap." "Strap" is a street term for a hand-gun. Gibson said, "I got it, I got it." In other recorded telephone conversations the two men continued the discussion and agreed to meet in order for Gibson to give Hampton the gun.

Hampton was fitted with a wire, and he and undercover police officer Alonzo Harris went to a building where Hampton was to meet Gibson. Another man came out of the building carrying a "Little Debbie" strawberry cupcake box from which Harris said he saw the grip of a gun protruding. The man handed the box to Gibson, who immediately handed it to Hampton. After the meeting, Hampton gave the box and the gun to Harris. The serial number on the gun was filed away.

After this transaction Hampton made another recorded call to Gibson. Hampton asked for a "few stacks," which is a couple thousand dollars, to "get low" once the murder took place. Gibson did not answer, but later Hampton was again wired and met Gibson at a gas station. Gibson indicated he would give Hampton the money after the murder. This meeting was also videotaped.

The FBI arrested Gibson at 11:45 p.m. on January 27, 2006, shortly after the meeting at the gas station. He was taken to the FBI offices and given *Miranda* warnings. Gibson waived his *Miranda* rights and gave a statement about his participation in the plot. He admitted that he gave a gun to Hampton so Hampton could kill Coleman. He indicated that he would pay Hampton but had not yet decided on the amount. After these statements Gibson began to write out a confession. However, the agents observed that Gibson was tired and offered to let him sleep and start the interview the next day. The

agents told Gibson he had a right under a local court rule to appear before a magistrate judge within 17 hours of his arrest. He signed a waiver of that right.

At 12:55 p.m. the next day he was brought back to the FBI office. He had been in custody for about 13 hours. The agents again reminded Gibson of his *Miranda* rights. He then completed a written statement in which he described his drug dealing with Coleman and admitted to complying with Hampton's request for cash in exchange for the murder.

A motion Gibson made to suppress his written statement was denied and he proceeded to trial. He was convicted on all counts. Gibson's appeal raises issues regarding the denial of his motion to suppress, the jury instructions on the murder-for-hire counts and the lack of a unanimity instruction, and the sufficiency of the evidence on the murder-for-hire count. He also contends that the errors involving the murder-for-hire charge require reversal of the entire judgment, including the gun charges.

We will turn first to the jury instructions on the murder-for-hire charge. When the challenge to a jury instruction implicates a question of law, our review is *de novo*. *United States v. Macedo*, 406 F.3d 778 (7th Cir. 2005). But the "district court is afforded substantial discretion with respect to the precise wording of instructions so long as the final result, read as a whole, completely and correctly states the law." *United States v. Lee*, 439 F.3d 381, 387 (7th Cir. 2006).

After all the testimony had been taken, the district judge, Charles R. Norgle, Sr., held a jury instruction conference at which each side's proposed instructions

were considered. It is notable that Gibson did not propose an instruction that would require the jury to agree unanimously on every element of the murder-for-hire count, and he also did not object to its absence—though he raises the issue on appeal. The judge rejected the three instructions Gibson proposed as to elements of murder for hire and rather used the instructions provided by the government.

The murder-for-hire statute, 18 U.S.C. § 1958(a), provides in part:

> Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both . . . .

The instructions given tracked the statute and stated that to sustain the charge the government had to prove three propositions. As relevant here, the instruction was that the government had to prove

> that anything of pecuniary value was received or promised or agreed to be paid as consideration for the murder.

"Anything of pecuniary value" was defined as it is in the statute: "money, a negotiable instrument, a commercial interest, or anything else the primary significance of

which is economic advantage." Finally, the instructions stated:

In considering whether "anything of pecuniary value" was received or promised or agreed to be paid as consideration for the alleged murder, you are instructed that not only money, but also drugs, guns, or involvement in future crimes which would yield cash profits, can also constitute consideration.

The issues Gibson raises involve the meaning of "consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value." He contends, in effect, that the word "consideration" imports civil contract law into the statute. His first proposed instruction was:

In considering whether something of pecuniary value was promised or agreed to be paid as consideration for a murder, you are instructed that the Defendant must have reached an agreement—that is, a contract—with a third person in which the Defendant and the third person exchanged mutual promises whereby the third person promised to commit the murder in exchange for the Defendant's promise to pay something of pecuniary value to the third person. If you find from your consideration of all the evidence that the government has failed to prove beyond a reasonable doubt that the Defendant reached such an agreement with a third person, then you must acquit Defendant of Counts One and Two.

He is not entirely without support for the proposition that civil contract law is somehow involved in the statute, but he stretches the proposition beyond the breaking point. In *United States v. Richeson*, 338 F.3d 653, 657 (7th

Cir. 2003), we said that "consideration retains its con-
tract law meaning of a bargained-for exchange of some-
thing of value" and that the statute requires a quid-pro-quo
between the solicitor and the murderer. But we also
cautioned that the use of the word "consideration" " 'does
not import all of contract law,' it should be interpreted
in accordance with its plain meaning, which is 'in return
for' or 'in exchange for,' " citing *United States v. Hernandez*,
141 F.3d 1042, 1057 (11th Cir. 1998).

The instructions given here make clear that the murder
must have been solicited in exchange for something of
pecuniary value. That is exactly what is required under
the statute. To go beyond that and instruct the jury that a
contract is required could mislead them into thinking
that some formal understanding—absurdly, perhaps even
a written document—is required. As Judge Norgle re-
marked to Gibson's attorney, "From your standpoint it
would be better if it was in written form and notarized?"
Obviously that sort of requirement would render the
statute meaningless. Criminals have a way of agreeing
and conspiring through the use of code language,
which clearly imparts their intentions while hoping to
hide their meaning from law enforcement. They are not
going to make things as clear as businessmen might. Why
would they? They are trying not to get caught, and they
certainly are not going to file a breach of contract action.
The instruction as given here was all that is required.

As to Gibson's other two proposed instruction, cases
from other circuits provide the impetus for his requests.
He wanted the jury instructed that

> In considering whether something of pecuniary
> value was promised or agreed to be paid as consider-
> ation for a murder, you are further instructed that an

> expectation that committing the murder will result in some economic benefit or unspecified payment does not constitute a promise or agreement to pay something of pecuniary value. Nor does a promise of a future unspecified favor or benefit or payment constitute a promise or agreement to pay something of pecuniary value, even if that favor or benefit or payment might confer significant economic benefit upon its recipient or otherwise have some value if tendered.

That instruction mirrors language in *United States v. Frampton*, 382 F.3d 213, 218 (2nd Cir. 2004), that "consideration in the form of a 'favor' is insufficient to support a conviction under § 1958 . . . ." *Id.* at 219. It was not error to decline the instruction. In *Frampton*, the only consideration was an unspecified favor. That is not the case here. There is evidence of consideration in the form of a cut of the drug proceeds and a money payment. Similarly, it was not error to reject the third of Gibson's instructions, which said that "payment or promise to pay incidental expenses does not constitute a promise or agreement . . . ." The only promise of payment which could be remotely considered incidental was a payment designed to help Hampton leave town after the murder. But getaway money is not money necessary to the commission of the murder and is not an incidental expense. There was no need for Gibson's instruction on this point.

Gibson cites other cases in support of his argument. But the evidence in those cases was far weaker than the evidence against him. For instance, in *United States v. Chong*, 419 F.3d 1076 (9th Cir. 2005), the court said there was no evidence of any quid pro quo. In that case, there was no evidence of an agreement or understanding be-

tween a leader of a gang and the hit man. *United States v. Wickland*, 114 F.3d 151 (10th Cir. 1997), is an almost inexplicable use of § 1958. There was no hit man at all. Wickland wanted his wife dead, and while he did talk with another man about it and had help in obtaining a firearm, Wickland himself is the one who was going to commit the murder. The government claimed he would benefit from the murder of his wife because she would no longer have an obligation to pay child support to her former husband and Wickland might receive the proceeds of her life insurance. But as the court noted, often murder is intended to benefit the murderer. That does not convert it into murder for hire. As the court also noted, the statute is intended to impose liability on both the person who ordered the murder and the hit man. In other words, it requires two participants. Obviously, without two people there can be no consideration, no promise, no agreement, nor anything else relevant to Gibson's case.

Gibson also contends there should have been a jury instruction requiring that the jurors agree unanimously as to which of the promises Gibson made; that is, 50 percent of the proceeds from the drug spot or a few hundred or a few thousand dollars. Despite his rather convoluted argument that he did, we find that Gibson did not object to the failure to give a unanimity instruction, and he did not propose one for the court's consideration.

Gibson's argument that he did propose a unanimity instruction is simply that his other proposed instructions "would—in effect—have required unanimity by expressly eliminating every alleged agreement or promise . . . except the thoroughly discredited and insufficient claim that Gibson promised Hampton half the proceeds from

a drug spot in exchange for the murder." The argument does not withstand scrutiny. It is true that if the judge had given Gibson's proposed instructions, the jury would have had, in effect, only one alleged promise to evaluate. In that case there would be no conceivable need for a unanimity instruction. But the judge rejected Gibson's instructions. Once his instructions were rejected, there was nothing to prevent him from proposing a unanimity instruction. He did not, thus forfeiting the claim and limiting our review to plain error.

Under Federal Rule of Criminal Procedure 52(b), if a "forfeited error is 'plain' and 'affect[s] substantial rights,' the court of appeals has authority to order correction, but is not required to do so." In other words, the rule is permissive, not mandatory. Under the doctrine, there must first of all be an error and the error must be plain. " 'Plain' is synonymous with 'clear' or, equivalently, 'obvious.' " *United States v. Olano*, 507 U.S. 725, 734-35 (1993).

We are not convinced that an error exists in this case, and even were we to say there was error, it is not "plain" error. Gibson relies on *Richardson v. United States*, 526 U.S. 813 (1999), for his contention that a unanimity instruction must be given. *Richardson* involved 21 U.S.C. § 848, the continuing criminal enterprise (CCE) statute. A CCE charge involves a violation of the drug statutes in which the violation is part of a "continuing series of violations." The Court determined that in a CCE case, the jury must unanimously agree not only that the defendant committed a continuing series of violations, but must also agree about which specific violations are involved. The issue boiled down to whether the phrase "series of violations" in the statute refers to one element—a series—in

respect to which the violations would be the "means," or whether the phrase created several elements—that is, each violation is a separate element. If it is the latter, as the Court decided it was, then the jury must agree on each violation. But the analysis was specific to the CCE statute. The Court noted that "a federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime." At 817. Using robbery as an example, the Court said:

> Where, for example, an element of robbery is force or the threat of force, some jurors might conclude that the defendant used a knife to create the threat; others might conclude he used a gun. But that disagreement—a disagreement about means—would not matter as long as all 12 jurors unanimously concluded that the Government had proved the necessary related element, namely, that the defendant had threatened force.

Our present case falls much closer to robbery than to CCE. The government had to convince the jury that Gibson promised Hampton some pecuniary gain, but unanimity was not required as to exactly what form the promise took.

Even were we to decide there was error, however, our discussion shows how far from clear the error would be. To be plain, error must be clear under current law. *Olano*; *United States v. Gaudin*, 515 U.S. 506 (1995). Where there is an unsettled question, the error is not plain and does not fall with Rule 52.

The Supreme Court has discouraged expansion of Rule 52 because to expand it "would skew the Rule's

'careful balancing of our need to encourage all trial partici-
pants to seek a fair and accurate trial the first time
around against our insistence that obvious injustice be
promptly redressed.' " *United States v. Young*, 470 U.S. 1, 15
(1985), quoting *United States v. Frady*, 456 U.S. 152, 163
(1982); *see also Johnson v. United States*, 520 U.S. 461 (1997).
In short, Gibson's challenge to the jury instructions fails.

Gibson also says that the evidence was insufficient to
sustain the conviction. On this claim he "bears a
heavy burden and faces a nearly insurmountable hurdle."
*United States v. Seawood*, 172 F.3d 986, 988 (7th Cir. 1999). In
reviewing a claim based on the insufficiency of the evi-
dence, we view the evidence in the light most favorable
to the government and uphold the verdict if any rational
trier of fact could have found the essential elements of
the crime beyond a reasonable doubt. *Jackson v. Virginia*,
443 U.S. 307 (1979). We do not reweigh evidence or
judge the credibility of witnesses. *United States v. Bow-
man*, 353 F.3d 546 (7th Cir. 2003). Issues of credibility are
for the jury. *United States v. Hodges*, 315 F.3d 794 (7th
Cir. 2003).

In this case, there was sufficient evidence of a promise
of consideration for the murder. First of all, Hampton
testified repeatedly—and the jury was entitled to believe
him—that Gibson promised him half of the drug pro-
ceeds from the drug spot. The promise is not so absurd
as Gibson would have us believe. Gibson argues he
would gain nothing from the murder if after the murder
he had to give 50 percent of the proceeds to Hampton
rather than Coleman. But Gibson's objection was not to
sharing the proceeds; rather, he was afraid Coleman
was going to have him killed. It is possible that Gibson
would be willing to partner with Hampton. At trial, during

cross-examination, Hampton was specifically asked about whether Gibson would be better off if Hampton, rather than Coleman, received 50 percent of the profits. Hampton testified that removal of a threat was the motive. The jury was free to believe that it was motive enough.

As to the promise to pay a few thousand or a few hundred dollars for the murder, Hampton testified that he asked for the money and Gibson did not refuse. Gibson admitted in his written statement that he complied with Hampton's request for money. In his oral statement Gibson did not deny that he promised to pay Hampton for the murder but indicated that he had not yet agreed on the price. Hampton testified that once the murder was complete he "was supposed to receive money to get out of town." He also said, "And then afterwards I would get 50 percent of the drug proceeds." The evidence is sufficient to allow the jury to believe that Gibson intended to pay Hampton for the murder.

Gibson tries to discredit Hampton's testimony by saying that, although Hampton said that he and Gibson talked about the murder all the time, when the conversations were recorded there was, suspiciously, no mention of murder. Hampton explained that during this whole time, Gibson was aware that the police were watching his drug spot. Especially on the telephone, but often in person, he and Gibson were careful about what they said. Hampton said they did not refer to a pistol over the phone (but rather a strap) because "pistol" would be incriminating. He explained that in a recorded conversation, when he referred to "How I am going to do it and everything," he was referring to the murder. In a later recorded conversation, he said that he was "Ready to do

this shit tonight." When asked what he meant, he said, "Meant that I was ready to do the murder." It was reasonable for the jury to credit Hampton's explanations.

Gibson also contends the evidence was insufficient to sustain the conviction for possession of a firearm with an obliterated serial number. We reject the contention. Hampton asked for a clean gun. Gibson gave him a gun which had an obliterated serial number. It is reasonable to infer that Gibson knew the gun was clean.

Gibson also claims that his written statement should have been suppressed. He says that his waiver of his right to appear before a magistrate judge within 17 hours after his arrest was involuntary because he was tired at the time of the waiver. He also says it violated the *McNabb-Mallory* rule [*McNabb v. United States*, 318 U.S. 332 (1943), and *Mallory v. United States*, 354 U.S. 449 (1957)]. On the denial of a motion to suppress, we review legal conclusions *de novo* and findings of fact for clear error. *United States v. Mendoza*, 438 F.3d 792 (7th Cir. 2006).

At the suppression hearing FBI agents testified that Gibson was taken to the FBI office after his arrest and was interviewed for three hours. During that time he made an oral statement in which he admitted to participating in the murder for hire and to the possession of a firearm. The agents gave Gibson a candy bar and a Diet Coke and let him use the restroom and make a phone call. When he began preparing a written statement he placed his head on the table. The agents thought he looked tired and offered to let him take a break. They explained that under a local rule of the Northern District of Illinois he was entitled to be brought before a magistrate judge within 17 hours. Gibson signed a written waiver of that right. He then was allowed to

sleep. The agents met with him the next day and again explained the 17-hour rule, and he again signed a waiver. This was 13 hours after his arrest, well within the 17 hours. He then wrote his statement.

We can find no error in Judge Norgle's finding that the waivers were voluntary. Nor could we find a violation of the *McNabb-Mallory* rule. The interrogations in those cases were conducted under circumstances vastly more coercive than what happened in this case.

The final issue Gibson raises is dependent on our setting aside his conviction on the murder-for-hire count. Because that conviction stands, Gibson's final issue is moot.

Accordingly, the judgment of conviction is AFFIRMED.