In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-2204

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WILLIAM P. MARR, also known as
BILL MARR, JR.,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 CR 24 — **Rubén Castillo**, *Chief Judge.*

ARGUED FEBRUARY 19, 2014 — DECIDED JULY 29, 2014

Before BAUER, FLAUM, and HAMILTON, *Circuit Judges.*

BAUER, *Circuit Judge.* A jury found William P. Marr, also
known as Bill Marr, Jr. ("Marr"), guilty of six counts of wire
fraud. Marr appeals his conviction, arguing that he did not
receive a fair trial because the government relied upon im-
proper propensity evidence to convict him, and that three jury
instructions incorrectly explained the law. He also contends

that the district court lacked the authority to order restitution. For the reasons that follow, we affirm.

## I. BACKGROUND

In July 2000, William C. Marr, the defendant's father, founded Equipment Source USA, LLC ("Equipment Source"), which sold used forklifts. The defendant Marr managed forklift sales and daily operations for the family business. Marr advertised forklifts for sale online and sold them online or over the phone.

In April 2001, the defendant's father opened a checking account for Equipment Source at Palos Bank and Trust[1] ("Palos Bank") and named Marr as a signatory. In January 2002, the defendant's father opened a second account at Palos Bank, a merchant account, which allowed Equipment Source to process credit card transactions. Marr was a signatory on the merchant account as well. Checks withdrawn from these accounts are at the heart of Marr's propensity argument.

From 2001 to 2003, Marr used Equipment Source to sell forklifts that he never actually owned or possessed. Marr's modus operandi was to advertise forklifts for sale online, collect credit card payments from out-of-state customers, and then purport to deliver the product without ever doing so. When customers did not receive the forklifts they ordered, they would contact Marr. Typically, a customer would com-

---

[1] Palos Bank and Trust Company closed on August 13, 2010, when it was acquired by First Midwest Bank. *Federal Deposit Insurance Corporation, Failed Bank List,* http://www.fdic.gov/bank/individual/failed/banklist.html (Last visited July 18, 2014).

plain that he received an invoice and a notice of shipment, and that Equipment Source charged his credit card, but that he never actually received the forklift he ordered. While Marr gave varying explanations to his unhappy customers, he rarely refunded their money or delivered the forklifts. Instead, his customers were forced to contact their credit card companies to dispute the charges. A customer's credit card company would then send notice of the dispute to Palos Bank, where the customer's payment was sent. Next, Palos Bank would notify Equipment Source that a customer disputed a charge and would request a response. Sandra Lecik handled all of the credit card disputes at Palos Bank, and she dealt exclusively with Marr when there were issues raised by Equipment Source customers. If Marr did not respond or the inquiry was resolved in the customer's favor, Palos Bank refunded the amount of the original charge back to the customer's credit card account by debiting Equipment Source's merchant account. When this occurred, it was called a "chargeback."

In 2002, Thomas Hullinger, Senior Vice President at Palos Bank, noticed a high incidence of chargebacks on Equipment Source's merchant account. Hullinger estimated that forty percent of Equipment Source's credit card transactions in 2002 resulted in chargebacks. The other 300-350 merchant accounts at Palos Bank had chargeback rates of less than two percent the same year.

In June 2002, Mr. Hullinger met with Marr to discuss the excessive chargebacks on the Equipment Source merchant account. The two men discussed Palos Bank's requirement that Equipment Source ship its products prior to charging its customers' credit cards. Marr said he would comply with Palos

Bank's requirement, but the high rate of chargebacks contin-
ued. From July through October 2002, the chargebacks on
Equipment Source's merchant account totaled almost $200,000.
At the end of October, Mr. Hullinger called a second meeting,
this time with both Marr and his father. He informed them that
they must maintain a reserve of over $90,000 in their merchant
account to cover any overdrafts and must provide proof of
delivery before Palos Bank would release funds from the
credit card sales into their account.

Equipment Source failed to maintain the required reserve,
so Palos Bank froze the company's accounts a few days after
the second meeting. Nevertheless, chargebacks from custo-
mers continued to be debited from the merchant account.

In November, twenty-eight chargebacks occurred, totaling
$153,930. Palos Bank applied the approximately $40,000
remaining in the merchant account to the balance. In Decem-
ber, another twenty-eight chargebacks occurred, totaling
$172,697; Palos Bank applied the approximately $13,000
remaining in Equipment Source's checking account to the
negative balance. The final balance of Equipment Source's
checking account was zero and the final negative balance of
Equipment Source's merchant account was $328,881.89—a loss
that Palos Bank paid to Equipment Source customers. Palos
Bank mailed Marr a letter requesting payment for the loss, but
no payment was remitted.

Although the record does not fully describe how, the
government was informed of the suspicious activity at Equip-
ment Source. In January 2003, the FBI executed a search
warrant at Equipment Source's offices and seized documents

and office equipment. Equipment Source ceased doing business shortly thereafter.

Eight years later, the government filed an information charging Marr with six counts of wire fraud related to his fraudulent forklift sales.

## A. The Trial Proceedings

At trial, the government presented testimony from fourteen Equipment Source customers who paid for forklifts but never received them. One of the defrauded customers testified that he went to Equipment Source's office to get his money back and met with Marr. Marr told him that he would refund the money, but needed to talk to his lawyer first. Marr never sent a refund. The customer identified Marr in the courtroom as the person he talked with during the visit. The government then called Ms. Lecik and Mr. Hullinger, the two employees from Palos Bank, who explained the chargebacks on the merchant account and identified Marr as having a significant role in the management of Equipment Source's bank accounts. As its final witness, the government called its financial expert witness, Bruce Killian, who analyzed the Equipment Source merchant account and confirmed the $328,881.89 loss to Palos Bank. The government introduced no evidence that Marr wrote checks from the Equipment Source accounts to "cash" or to the "Four Seasons Currency Exchange."

Marr then presented his case and called Lee Williams, a former IRS agent, to testify as an expert witness. He stated that he had reviewed Equipment Source's financial records and calculated that Marr and his wife had loaned Equipment Source over $1.1 million, but had been reimbursed less than

$900,000. Williams explained that the personal funds in the company accounts mainly came from Marr and his wife's home equity line of credit account and their personal money market account. Williams concluded that Marr deposited over $200,000 more into the Equipment Source accounts than he withdrew. Williams also described checks written from the Equipment Source account to cash or a currency exchange in October 2002. For example, Williams said one check was written to "cash" in the amount of $266 for "office supplies," another was written to a "currency exchange" for "license and permits," and another was written to "cash" in the amount of $2,450, this time for "cost of goods sold."

On cross-examination, the government questioned Williams about checks that had been written from the Equipment Source checking account to cash or to the currency exchange. Williams stated that the memo line of the checks often noted that the withdrawal was for the "cost of goods sold," but admitted that he did not consider these checks in his calculations at all because he was only hired to analyze the net amount Marr and his wife loaned the business from their personal accounts. He also conceded that writing checks to cash was an unusual business practice because the IRS will deny a business expense if it cannot be verified by an invoice or receipt of some sort. When the prosecutor asked, "So the problem with all these checks to cash is you don't know where that money went, do you?" Williams responded, "No one does." Marr's lawyer objected twice during the cross-examination. First, to scope, which the judge overruled and then to facts not in evidence, which the judge sustained. Marr's lawyer never objected on Rule 404(b) grounds.

The government recalled its financial expert witness Killian to rebut Williams' testimony. Since Williams' testimony introduced information about checks being converted to cash, Killian addressed this issue. The government introduced an exhibit that summarized the checks written to cash or to the currency exchange as compared to cash deposits. The chart documented the Equipment Source checking account from January 7, 2002, through October 30, 2002. Killian noted that the cash withdrawals totaled over $1.3 million and the cash deposits totaled only about $700,000, leaving the net cash withdrawals around $600,000. The government also introduced an exhibit summarizing the amount of chargebacks for all twelve months of 2002, which totaled about $600,000; approximately fifty percent of Equipment Source's credit card sales. Again, Marr's lawyer never objected on Rule 404(b) grounds.

Marr's lawyer cross-examined Killian. On redirect, the prosecutor asked only one question, it was about what was written on the memo line of two checks dated October 29, 2002:

> Mr. Killian, in your experience as a revenue agent, would that entry in the memo line, cost of goods sold, would that be the kind of sufficient documentation that would have allowed those checks to be accepted as business deductions in an audit?

Killian responded, "No." Marr's lawyer then objected "about anything to do with taxes" and asked for a sidebar. The judge denied the sidebar because it was the government's last question on redirect and he overruled the objection. After-wards, the government rested.

The next day, Marr's lawyer renewed her objection about the introduction of evidence relating to taxes and moved for a mistrial. She argued that Killian's "line of questioning [had] injected into a wire fraud case the possibility that there could have been tax fraud." The judge denied the motion.

In closing argument, the prosecutor relied on the Equipment Source checks that had been written to cash or to the currency exchange and stated that the checking withdrawals did not reflect a "legitimate business" practice. And in rebuttal argument, the prosecutor questioned Marr's honesty and called Equipment Source a "sneaky, dirty business." Marr's lawyer made no objection.

At the jury instruction conference, Marr objected to Jury Instructions Nos. 25, 31, and 32. The judge overruled Marr's objections to all three instructions and tendered the instructions to the jury.

The jury found Marr guilty on all six counts of wire fraud in violation of 18 U.S.C. § 1343. The district court sentenced Marr to a term below the advisory guideline range of 57 to 71 months. Marr received 3 years' imprisonment, followed by 2 years of supervised release, and was ordered to pay $328,881.89 in restitution to Palos Bank.

## II. DISCUSSION

On appeal, Marr raises three issues. He contends that (1) the government improperly introduced and relied on evidence implying that he had a propensity to commit illegitimate tax practices; (2) the jury instructions given at trial were legally

erroneous; and (3) the district court erroneously ordered him to pay restitution to Palos Bank. We address each issue in turn.

### A. Propensity Evidence

Marr argues that the government's references to Equipment Source checks that were written to "cash" or to the "currency exchange" violated Rule 404(b). He contends that on three occasions the government referred to these checks to suggest that he had a propensity to commit illegitimate tax practices: (1) when the government cross-examined Williams; (2) when the government questioned Killian on redirect; and (3) when the government relied on the evidence in its closing arguments.

We review the district court's evidentiary ruling for an abuse of discretion. *United States v. Collins*, 715 F.3d 1032, 1037 (7th Cir. 2013). To preserve an issue for appeal, counsel must "make a timely objection or motion to strike; and state[] the specific ground, unless it was apparent from the context." Fed. R. Evid. 103(a). A terse motion in limine is not specific enough to meet the requirements of Fed. R. Evid 103(a). *United States v. Gulley*, 722 F.3d 901, 906 (7th Cir. 2013). We review issues not properly raised before the district court for plain error. *Id*. A plain error seriously affects the "fairness, integrity, or public reputation of judicial proceedings" because it deprives the defendant of a fair trial, to the point that "the defendant would have been acquitted otherwise," and the error "was so obvious and so prejudicial that a district judge should have intervened without being prompted by an objection from defense counsel." *United States v. Haldar*, 751 F.3d 450, 456 (7th Cir. 2014).

Marr contends that we should review all three of his Rule 404(b) arguments using an abuse of discretion standard,

claiming that his pre-trial motion in limine objection preserved the issue for appeal. We disagree.

Marr's motion related to prospective testimony from a witness who never actually testified at trial; not Williams. Marr did object twice during Williams' testimony, but never on propensity grounds. Therefore, Marr's objections did not preserve the issue and so we review the checks evidence introduced during the cross-examination of Williams for plain error.

### 1. The Government's Cross-Examination of Williams

Evidence is not admissible for propensity purposes—a prior crime, wrong, or bad act that is introduced to show that a person repeated his or her bad character on this particular occasion. Fed. R. Evid. 404(b)(1). The evidence is admissible for other purposes, however, if the prosecutor: (1) offered it for a purpose other than propensity, (2) it was similar and close enough in time to be relevant to the matter at issue, (3) it was supported by sufficient preliminary evidence for a jury to find that the defendant committed the prior act, and (4) it had a probative value that was not substantially outweighed by the danger of unfair prejudice, as required by Fed. R. Evid. 403. *Gulley*, 722 F.3d at 906 (citing *United States v. Hicks*, 635 F.3d 1063, 1069 (7th Cir. 2011)).

Applying this test to Williams' testimony relating to the checks written to cash or to the currency exchange, we find that Williams' testimony was permissible under Rule 404(b). First, the evidence was used for a purpose other than propensity; the government cross-examined Williams to call into question the accuracy of his analysis. Williams admitted that

his analysis did not include the net $600,000 of withdrawals from the Equipment Source checking account. He also admitted that writing checks to cash or a currency exchange was an unusual business practice. The government questioned Williams to prove Marr's intent to commit wire fraud, not to show that Marr committed tax fraud in the past and had done so again on this occasion.

Second, Williams' testimony about the Equipment Source checks being converted to cash was extremely relevant. The government alleged that Marr used the Equipment Source bank accounts at Palos Bank to evade $328,881.89 in chargebacks and that the scheme took place from November 2001 to May 2003. Williams testified about the same Equipment Source bank accounts and described transactions that occurred at the same time as Marr's wire fraud.

Marr makes a decent argument that the evidence does not support a finding that he was the one who converted the Equipment Source checks to cash, since he did not sign the Equipment Source checks converted to cash (his father, William C. Marr did) and there is no evidence that he either cashed any of the checks or received any of the money. However, the amount of evidence needed to link a defendant to a prior bad act, is light; *any* evidence of the defendant's participation in the prior act beyond his mere presence is sufficient. *United States v. Coleman*, 179 F.3d 1056, 1061 (7th Cir. 1999). Here, the government showed that Marr managed daily operations for Equipment Source, he was a signatory on the merchant account, and he deposited substantial amounts of money from his and his wife's home equity line of credit account and their personal money market account into the

Equipment Source accounts. Therefore, the jury could reason-ably conclude that Marr participated in the scheme to convert Equipment Source checks to cash.

Finally, though Marr asserts that the evidence of the $1.3 million in checking withdrawals converted to cash prejudiced him because the jury could have harbored a bias against him due to his wealth, he has pointed to no evidence in support of this assertion. The evidence of the Equipment Source checks converted to cash is highly probative of Marr's intent to commit wire fraud, and substantially outweighed any risk that the jury would convict Marr for uncharged tax fraud offenses instead of wire fraud charges.

For the reasons discussed above, Williams' testimony about the checks being converted to cash was permissible under Fed. R. Evid. 404(b). The district court did not commit plain error by allowing Williams to answer the government's questions.

### 2. Killian's Rebuttal Testimony Regarding the Checks Converted to Cash

Marr contends that he timely objected on Rule 404(b) grounds during Killian's rebuttal testimony, so our standard of review should be for an abuse of discretion. We agree.

Though Marr did not object until the close of Killian's rebuttal testimony, an objection does not have to be "perfectly contemporaneous with the challenged testimony" to preserve an issue for appeal. *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 727 (7th Cir. 1999). An objection at the "close of that witness's testimony or prior to the start of proceedings the very next day" would suffice to allow the court to cure "any error by

issuing a limiting or curative instruction while the testimony is still relatively fresh in the mind of the jurors." *Id*. Therefore, we review the district court's evidentiary ruling for an abuse of discretion.

Essentially, Marr makes the same argument he did about Williams' testimony; he contends that the government introduced improper tax fraud evidence at trial when it questioned Killian about the checks converted to cash. Killian testified about the same evidence Williams discussed during his direct and cross-examination. Marr cannot now "complain on appeal [because] the opposing party subsequently introduce[d] evidence on the same subject." *United States v. Touloumis*, 771 F.2d 235, 241 (7th Cir. 1985). It was Marr who first introduced evidence of the checks converted to cash when his expert witness, Williams, testified about it. The evidence of checks being converted to cash was permissible under Rule 404(b). The district court did not abuse its discretion when it overruled Marr's objection to Killian's rebuttal testimony or when it denied Marr's motion for a mistrial after the close of evidence.

### 3.  Prosecutor's Statements

Marr argues that the government improperly relied on the checks-to-cash evidence for propensity purposes in its closing and rebuttal arguments as well. Since Marr did not object to the government's statements at trial, our review is for plain error. *United States v. Bell*, 624 F.3d 803, 811 (7th Cir. 2010). To prevail, Marr must establish that the government's remarks were improper and show that he was denied a fair trial because of them. *Id*.

Marr contends that the prosecutor's remarks in his case were comparable to the improper propensity comments made by the prosecutor in *United States v. Richards*, 719 F.3d 746 (7th Cir. 2013). In *Richards*, the prosecutor repeatedly called the defendant a "drug-dealer" in his closing argument and said, "[c]learly the defendant's drug dealing is not limited to California. It happens here too." *Id.* at 764. The court held that the comments were improper because the prosecutor made "the [propensity] argument 'once a drug dealer, always a drug dealer.'" *Id.* (citing *United States v. Jones*, 389 F.3d 753, 757 (7th Cir. 2004)). Here, the government made no such propensity argument.

In closing argument, the prosecutor referred to the checks that were converted to cash and asked, "what legitimate business does that? What legitimate business writes $1.3 million to cash and to a currency exchange?" These remarks were "reasonable inferences from the evidence adduced at trial." *See United States v. Nunez*, 532 F.3d 645, 654 (7th Cir. 2008). We find no impropriety in the government's closing argument.

None of the prosecutor's remarks during rebuttal closing were improper either. The prosecutor remarked that Equipment Source was a "sneaky, dirty business." Prosecutors are allowed to comment on the weakness of the defense's theory. *Id.* at 654; *see also United States v. Glover*, 479 F.3d 511, 520 (7th Cir. 2007). The prosecutor's remarks were in response to Marr's defense that he honestly tried to rescue his failing business. Therefore, we find no impropriety in the government's rebuttal argument either.

### B. Jury Instructions

Marr also challenges Jury Instructions Nos. 25, 31, and 32. He argues that the instructions were erroneous because they did not require the government to prove that Marr specifically intended to defraud a financial institution, i.e., Palos Bank.

We review challenges to jury instructions *de novo*. *United States v. DiSantis*, 565 F.3d 354, 359 (7th Cir. 2009). "The district court 'is afforded substantial discretion with respect to the precise wording of instructions so long as the final result, read as a whole, completely and correctly states the law.'" *Id.* (quoting *United States v. Gibson*, 530 F.3d 606, 609 (7th Cir. 2008)). We reverse only if the instructions as a whole do not correctly inform the jury of the applicable law and the jury is misled. *Id.*

In this case, the district court tendered the following instructions to the jury over Marr's objections:

**Instruction 25**

As used in these instructions, the phrase "intent to defraud" means that the acts charged were done knowingly with the intent to deceive customers of Equipment Source USA in order to cause a gain of money or property to the defendant or the potential loss of money or property to another.

**Instruction 31**

A scheme "affected" a financial institution if it exposed the financial institution to a new or increased risk of loss.

**Instruction 32**

The government must show that the defendant engaged in a scheme to defraud with a specific intent to defraud and that the scheme affected a financial institution. The government is not required to prove that the defendant intended to defraud a financial institution.

"To convict a defendant of wire fraud, the government must prove three elements: (1) the defendant participated in a scheme to defraud; (2) the defendant intended to defraud; and (3) a use of an interstate wire in furtherance of the fraudulent scheme." 18 U.S.C. § 1343; *United States v. Turner*, 551 F.3d 657, 664 (7th Cir. 2008). Marr's argument focuses solely on the second element of the offense, the required *mens rea*.

To convict Marr of wire fraud, the government was not required to prove that Marr specifically intended to defraud Palos Bank. While our circuit has yet to specifically address this issue, the Third Circuit held that 18 U.S.C. § 1343 requires a jury to find only that the defendant "had the intent to defraud" and need not find that the defendant intended to defraud a financial institution because "the object of the fraud is not an element of the offense." *United States v. Pelullo*, 964 F.2d 193, 216 (3d Cir. 1992). In a recent wire fraud case in the First Circuit, the court "flatly rejected the idea that the government is obliged to prove that the defrauders intended to defraud a specific victim." *United States v. Tum*, 707 F.3d 68, 76 (1st Cir. 2013). We join the reasoning of our sister circuits and hold that the wire fraud statute only requires the government to prove that a defendant intended for his or her scheme to defraud

*someone*, a financial institution does not need to be the intended victim.

Here, the district court modeled Instruction 25 after the Pattern Criminal Jury Instruction for the Seventh Circuit that defines the "intent to defraud" for 18 U.S.C. § 1343. We presume that the Pattern Criminal Jury Instructions for the Seventh Circuit correctly state the law, *United States v. Leahy*, 464 F.3d 773, 796 (7th Cir. 2006), and Marr does not argue that the formulation of the pattern instruction was in error. At trial, the government showed that both Equipment Source customers and Palos Bank fell victim to Marr's scheme. Therefore, naming the Equipment Source customers as the intended victim of Marr's scheme in Instruction 25 correctly informed the jury on the applicable law.

There is not a Pattern Criminal Jury Instruction for the Seventh Circuit directly applicable to Instruction 31. However, there is a Seventh Circuit case. In *United States v. Serpico*, 320 F.3d 691, 694 (7th Cir. 2003), we approved a jury instruction in a wire fraud case which stated that "schemes affected the banks if they 'exposed the financial institution[s] to a new or increased risk of loss.'" (citing the jury instruction). While the precise wording of Instruction 31 is not the same as the instruction in *Serpico*, it does completely and correctly state the law.

There is not a Pattern Criminal Jury Instruction for the Seventh Circuit for when a wire fraud scheme affects a financial institution either. However, we find that Instruction 32 correctly informed the jury of the applicable law. To convict Marr of wire fraud, the government needed only to

prove that Marr's scheme to defraud affected Palos Bank, not that Marr intended to defraud Palos Bank. As we clarified above, in a wire fraud case the "object of fraud is not an element of offense." *Pelullo*, 964 F.2d at 216. Therefore, we hold that the district court properly instructed the jury on the *mens rea* required to support Marr's wire fraud conviction.

### C.  Restitution Order

Marr's final argument is that the district court did not have authority to order restitution to Palos Bank. He contends that Palos Bank does not qualify as a victim under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663. We review *de novo* the district court's authority to order restitution. *United States v. Hosking*, 567 F.3d 329, 331 (7th Cir. 2009).

The MVRA requires the court to order a "defendant [to] make restitution to the victim of the offense" and defines a victim as "any person directly harmed by the defendant's criminal conduct in the course of the scheme." 18 U.S.C. § 3663A(a)(1)-(2). The purpose of the MVRA is to compensate victims for harm "caused by the specific conduct that was the basis of the offense of conviction." *See United States v. Donaby*, 349 F.3d 1046, 1052 (7th Cir. 2003) (citing *Hughey v. United States*, 495 U.S. 411 (1990)). The court determines who is a victim by a preponderance of the evidence during sentencing. *Id*. at 1053.

Palos Bank easily qualifies as a victim under the MVRA definition of a victim. The record contains ample evidence showing that Palos Bank was directly harmed by Marr's wire fraud scheme. Marr charged Equipment Source customers for forklifts he neither owned nor delivered. The customers

received refunds paid out of Equipment Source's merchant account. Marr depleted the funds below the reserve required to maintain the merchant account. Chargebacks continued to accrue after Palos Bank suspended the Equipment Source accounts. Afterwards, Palos Bank paid the $328,881.89 deficit to Equipment Source customers and was never reimbursed by Marr. Therefore, the district court had the authority to order restitution payable to Palos Bank.

## III. CONCLUSION

The district court properly admitted evidence regarding Equipment Source checks written to cash or to the currency exchange, the three challenged jury instructions were proper, and the district court had the statutory authority necessary to order restitution payable to Palos Bank. The judgment of the district court is AFFIRMED.