In the

# United States Court of Appeals

### For the Seventh Circuit

No. 15-1279

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LUIS CONTRERAS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11-CR-346-2 — **Samuel Der-Yeghiayan**, *Judge*.

ARGUED OCTOBER 29, 2015 — DECIDED APRIL 19, 2016

Before FLAUM, MANION, and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. Law enforcement stumbled upon
the then- unknown Luis Contreras when the original target
of their narcotic sales investigation drove into Contreras'
garage and the two men conducted a drug transaction with-
in view of the police with Contreras' garage door ajar. Con-
treras eventually pleaded guilty to narcotics distribution, but
reserved the right to challenge the denial of a motion to sup-
press the evidence found in a search of his house. We affirm.

**I.**[1]

As part of a larger-scale drug trafficking investigation, the Drug Enforcement Agency and the Chicago Police Department (collectively, "officers") teamed up to investigate drug trafficking in Chicago. On November 9, 2010, officers observed Alejandro Soto at the residence of one of the major drug suppliers targeted in the investigation. They began surveillance at Soto's house the following morning, and began following him as he entered his car with two large garbage bags in tow. After Soto discarded the bags in a nearby dumpster, the officers recovered the bags and found that they contained clear plastic tape, latex gloves, coffee grounds and aluminum foil molded into a brick-shape the size of a kilogram of cocaine. Based on their experience, the officers believed these items were drug packaging materials (coffee grounds are often included with drug packaging material to mask the odor). A canine called to the scene alerted to the presence of narcotics, and indeed, subsequent laboratory testing revealed the presence of cocaine.

Officer Raphael Mitchem, another of the officers following Soto, received word through radio transmissions that Soto had discarded packaging consistent with multi-kilogram quantities of narcotics. Armed with that information, as well as the knowledge of Soto's earlier rendezvous with the known drug supplier, Officer Mitchem and the others continued their surveillance of Soto, following

---

[1] The facts are taken primarily from the testimony presented at the suppression hearing. (R. 89, pp. 1-57) (Tr. 4-26-12, 9:30 a.m.) (PageID 516-572); (R. 90, pp.58-231) (Tr. 4-26-12, 1:00 p.m.) (PageID 573-746); (R. 91, pp.1-36) (Tr. 5-3-12, 1:30 p.m.) (PageID 747-782). Below we will discuss other versions of the facts that appear in the record.

him until he reached Contreras' house on the northwest side of Chicago. The officers had never heard of Contreras, nor targeted him until that moment that Soto led the officers to his house. Soto entered Contreras' garage and the door closed behind them.

Contreras lived on a cul-de-sac and therefore, in order to avoid suspicion, the officers spread out and set up their surveillance as follows: Officer Mitchem arrived shortly after the garage door closed and parked across the street from the house facing the garage, approximately fifty feet away with a straight and unobstructed view of the garage. Officer Clark Eichman was on foot in a small park thirty to forty yards north of Contreras' house with a clear view of the side of the garage, and, at an angle, a bit of the garage door. *See* Gov't Br. App. GA002. He could not see into the garage, but could see Mitchem. Officer Ruben Briones parked his vehicle outside the entrance of Contreras' cul-de-sac where he could see Contreras' house. Other officers accompanied the ones above, but they did not testify and their presence and actions are not at issue.

After Soto had been in Contreras' house for a short while, the garage door opened. Officer Mitchem testified at the suppression hearing that, using his binoculars, he had a very clear view of what was happening inside the garage. He saw Soto's white van on the right side of the garage and what would later be identified as Contreras' silver Mercedes on the left. He then saw the two men touch hands in what he thought indicated the passing of money or drugs, although he could not directly see either. Contreras leaned into the front passenger side of his Mercedes and the rear hatchback opened. Soto opened the rear of his van, reached in and re-

moved an orange shoebox with tape around the outside, but not sealing it. As Soto started walking with the box toward Contreras' Mercedes, Officer Mitchem saw the box begin to buckle, fall to the ground, and a rectangular, white object wrapped in plastic fell out. Officer Mitchem testified that he recognized the object as a kilogram of narcotics and therefore radioed the other officers about his observations.

Soto then picked up the box and walked to the rear compartment of his minivan. Soto turned his back to Officer Mitchem, and when he turned back around, the orange box and narcotics were gone, but he was carrying a tan plastic bag and walking toward Contreras. The orange box with narcotics was not visible in the back of the van, so Officer Mitchem surmised that it was now in the tan bag. Officer Mitchem conveyed this information over the radio and then he heard an order to "go, go, go … " meaning "go into the garage for an arrest." Officer Mitchem pulled his car straight ahead and was the first officer into the garage. As he jumped out of the car, he identified himself as a police officer and drew his weapon. Soto immediately dropped the plastic bag to the ground. Mitchem testified that he then heard a woman scream and saw her run from the top of the short flight of stairs leading from the garage to the house, back into the house. He ordered the two men to the ground with the bag of narcotics just behind them. Later, officers determined that the shoebox contained five individually wrapped bricks of cocaine.[2] As the other officers arrived, Mitchem yelled out a warning that he had seen someone at the back of the garage.

---

[2] All of the physical evidence in this case was missing at the time of the suppression hearing and was still missing at the time of oral argument, although photographs of the evidence were entered into evidence and

Officer Eichman arrived fifteen to twenty seconds behind Officer Mitchem and handcuffed Contreras, noting the over-stuffed Nike shoebox with suspected narcotics sticking out of the box. Agent Briones also entered within seconds of the call to move in. Once inside the garage, Agent Briones believed that he heard a rustling from inside the house, and heard someone yell "door, door." Consequently, almost immediately he and the other officers kicked in the door connecting the garage to the house and performed a brief protective sweep lasting less than a minute. The officers testified that they did not search any drawers, containers, or other places for evidence or contraband, but merely looked for people so that they could ensure the safety of the arresting officers. Indeed they uncovered no evidence in the course of the protective sweep.

The officers did discover another person in the house—Contreras' sister-in-law. After confirming that no one else was in the house, they brought Contreras inside.[3] The officers read Contreras his Miranda rights in Spanish and English and he signed a written consent to search in both languages. Contreras expressed a willingness to cooperate with the officers, telling them that he had cooperated with law enforcement in the past. He then admitted that he had been selling drugs with Soto for about one year and that Soto had brought him the five kilograms of cocaine which he and Soto were going to break down and store in a garage in Chicago.

---

can be viewed at R. 188 and in the appendices of both of the briefs in this case. *See* Def. Br. App. 14, 40. Gov't Br. App. pp. GA001-2.

[3] They also discovered Contreras' two-year-old son sleeping in the car and eventually turned him over to Contreras' sister-in-law.

Contreras provided the officers with the combination to a safe in his bedroom where the officers found $99,153 in cash, two guns and ammunition just as Contreras had described they would. He also told them where to find 2.5 kilograms of cocaine in a closet. When the officers could only find two of the kilograms, Contreras gave them additional instructions to find the remaining half kilogram. In other words, he appeared to have been fully cooperative and forthcoming at the time of the search and seizure.

On September 6, 2011, Contreras filed a motion to suppress, claiming that the government obtained the evidence in violation of his Fourth Amendment rights and sought to suppress the seized evidence. Contreras asserted that the initial entry into the garage and the protective sweep were both illegal and that Contreras' consent to search the house was not consensual as it was tainted by the illegal acts. The court denied the motion to suppress on June 26, 2012, and subsequently, Contreras entered a conditional plea of guilty to Count One of the indictment which charged him with conspiracy to knowingly and intentionally possess with intent to distribute and to distribute 500 grams or more of cocaine in violation of 21 U.S.C. § 846. Contreras reserved the right to appeal the district court's denial of his motion to suppress. On January 19, 2015, the district court sentenced Contreras to 148 months' imprisonment. He appeals the denial of the motion to suppress.

## II.

### A.    The search of the garage.

Contreras urges this court to overturn the district court's finding that the entry and search of the garage was a reason-

able one. To do so, we would be required to overturn both the district court's legal finding, which we review de novo, and its factual findings which we review for clear error only. *United States v. Borostowski*, 775 F.3d 851, 863 (7th Cir. 2014).

Turning first to the legal argument, Contreras makes a generalized Fourth Amendment argument about the right of people to be secure in their homes. *See* U.S. Const. amend. IV. It is true that in Fourth Amendment jurisprudence, the home is sacrosanct. Contreras makes many arguments about the curtilage of the house, but these are red herrings. This is not a case about the curtilage of the house, nor even one where officers knocking at a door peer through the opened crack and see contraband in plain view. *See, e.g., Hadley v. Williams*, 368 F.3d 747, 750 (7th Cir. 2004). In this case Contreras and Soto conducted their drug transaction in an attached garage with the door wide open—in essence with one whole wall of the house removed by their choice and displaying their drug transaction in plain view. Officer Mitchem did not need to step foot on Contreras' property or enter the curtilage to see what he saw in plain view. He could see it from his car parked approximately fifty feet away. (He did use binoculars to aid his view, but the use of binoculars or lighting to improve the visibility of an object already in plain view has long been held to be constitutional. *See Texas v. Brown*, 460 U.S. 730, 740 (1983)).

Once Contreras entered the garage with its wide-open-to-any-passer-by view, he no longer had an expectation of privacy. "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Florida v. Riley*, 488 U.S. 445, 449, (1989) *quoting Katz v. United States*, 389 U.S. 347, 351 (1967).

Thus a defendant does not have an expectation of privacy from a police helicopter flying over his greenhouse, even when he has taken great pains to hide the greenhouse by enclosing it on two sides, obscuring 80% of the roof, and hiding it from view on the other sides with trees, shrubs, and his nearby home. *Riley*, 488 U.S. at 448, 450-51. The police do not violate the Fourth Amendment by viewing anything in plain sight "from a public vantage point where they have a right to be," *Id.* at 449. And they may walk up to any part of private property that is otherwise open to visitors or delivery people. *United States v. LePage*, 477 F.3d 485, 488 (7th Cir. 2007). And, when they are legally in a place that they may be, they may look through windows and doors and other openings into homes and other places protected by the Fourth Amendment. *United States v. Dunn*, 480 U.S. 294, 303-04 (1987). Of course, then, they may also look into an open garage from a vantage point on the public way.

We need not resolve whether an attached garage is a sufficiently integral part of a house or its curtilage such that officers cannot enter without either a warrant or exigent circumstances—although it seems fairly certain that Contreras' attached garage would be protected as part of his home, and at least one of our unpublished decisions has suggested so. *See United States v. Craig*, No. 93-1761, 1993 WL 498029, at *5 & n.3 (7th Cir. Dec. 2, 1993) (unpublished table decision) (police could not enter the garage without a warrant or exigent circumstances), *amended* Dec. 3, 1993. *See also, Siebert v. Severino*, 256 F.3d 648, 654 (7th Cir. 2001) (people have a reasonable expectation of privacy in a barn located in a fenced-in area, within 60 feet of their home, with doors which were frequently kept locked). But in this case, the defendant, along with his former co-defendant, were engaged in a drug

transaction in a garage with the door wide open in plain view of the public way. The police did not enter his property without a warrant, consent, or exigent circumstances. In fact, the police officers all remained at least 30-50 feet away until they saw evidence of contraband and a crime. It was not until they saw the contraband that they entered. If a police officer, through an open door, sees evidence of a crime, or a person whom they have probable cause to believe has committed a crime and should be arrested, or contraband, and "the police reasonably fear that before they can obtain a warrant the contraband or evidence will be destroyed or the criminal flee the nest, the case becomes one of 'exigent circumstances' and the police can take steps to secure the evidence or the person." *Hadley*, 368 F.3d at 750. *See also Coolidge v. New Hampshire*, 403 U.S. 443, 465-68 (1971). In this case, the officers saw, in plain view, evidence of a crime in progress and contraband. The officers were justified in taking steps to secure the evidence and arrest the suspects.

In essence then, in this way the concept of plain view and exigent circumstances merge. It is, in fact, what the officers see in plain view that can trigger the exigent circumstances that require them to act without a warrant. This was precisely the case here.

The Supreme Court has articulated three requirements for a warrantless seizure of incriminating evidence. First, the officer may not have violated the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. Second, the item must have been in plain view, and third, its incriminating character must also be immediately apparent. *Horton v. California*, 496 U.S. 128, 136 (1990); *United States v. Curlin*, 638 F.3d 562, 566 (7th Cir. 2011).

The officers here were on public property where they were entitled to be and witnessed the drugs fall to the ground in plain view. Based on their experience with drug packaging, they testified, it was immediately apparent to them that they were witnessing a drug transaction. Adding to that knowledge, the police also knew that Soto had recently visited the home of a major drug supplier, had just discarded drug packaging materials, and had just engaged in what looked to be a hand-to-hand drug transaction with Contreras. The police did not violate the Fourth Amendment, therefore, by entering the garage after the drugs in plain view gave rise to exigent circumstances. Consequently, there is no reason to delve into the question of the level of expectation of privacy a person has in her garage—and whether it matters whether the garage was attached, not attached and how far it may be from the house. In this case, of course, the garage was attached to the house and one could enter the house through an interior door just as readily as one could cross between any other rooms in the house. But in any event, none of that matters, for once Contreras removed the fourth wall of his garage (by opening the garage door), he had no reasonable expectation of privacy in anything he displayed to the public through that open door.

This leads to Contreras' main argument in which he questions whether the police actually saw the drug contraband in plain view in the garage. But as the standard of review dictates, we must accept the district court's credibility determination unless the facts, as testified to by the police officers, were so unbelievable that no reasonable factfinder could credit them. *United States v. Pineda-Buenaventura*, 622 F.3d 761, 774 (7th Cir. 2010), *as amended on denial of reh'g* (Oct. 6, 2010). The court is fond of describing attacks on fac-

tual findings as uphill battles, and nowhere is this more true than when it comes to credibility determinations. "The district court is best situated to make credibility determinations in light of the totality of the evidence, including the witness's statements and behavior, other witness statements, and corroborating or contrary evidence." *United States v. Austin*, 806 F.3d 425, 431 (7th Cir. 2015). A credibility determination will be overturned only if credited testimony is internally inconsistent, implausible, or contradicted by extrinsic evidence. *Blake v. United States*, No. 15-1239, 2016 WL 762068, at *3 (7th Cir. Feb. 26, 2016). As the defendant himself pointed out, "unless the trial court has credited testimony that is contrary to the laws of nature or so internally inconsistent or implausible on its fact[s] that no reasonable factfinder would credit it, we defer to the trial court's finding." *Pineda-Buenaventura*, 622 F.3d at 774. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985). On the other hand, our decision is not a rubber stamp. "[S]imply affixing the label 'credibility determination' will not insulate a decision from review, and the court must base a finding on evidence, not mere speculation. *Blake*, 2016 WL 762068, at *3. This court has carefully reviewed the transcripts and evidence before the district court, and can find no reason to upset the factual findings.

Contreras focuses on several discrepancies in the officers' stories, but at the evidentiary hearing, the officers offered explanations for the discrepancies and they were not so farfetched as to defy all plausibility. Officer Mitchem, the key witness, testified that he saw the garage door open, that he had a clear view from the street from which to see a hand-to-

hand transaction followed by Soto carrying and then drop-
ping an orange shoebox from which a package, that he rec-
ognized as typical of narcotics, fell to the ground. Officer
Eichman corroborated Mitchem's testimony. He was listen-
ing in on the radio as Mitchem was reporting what he saw,
and heard that the garage door was opening as he saw it
happen from his vantage point on the side of the house. He
entered the garage just seconds after Mitchem and testified
that when he arrived, he saw Mitchem trying to detain Soto
and then saw the bag with the narcotics on the ground.
Agent Briones also heard Mitchem relay over the radio that
the garage door had opened and that there were two men
inside, and arrived within seconds to see just that. The pho-
tographic evidence also aligns with the testimony. Photo-
graphs taken at the scene show an orange shoebox with nar-
cotics as all three testifying officers described.

Contreras does not argue that there is no basis for the
district court's factual findings, but instead states that Of-
ficer Mitchem's testimony was not a credible basis for the
district court's factual findings, that he was dishonest and
that it was "improbable to believe" and "implausible." Def.
Br. pp.18-26. The district court had before it these same criti-
cisms of Mitchem and yet rejected the argument, finding,
"[t]o the extent that Contreras pointed to inconsistencies in
prior statements and testimony by Agent Mitchem, Agent
Mitchem adequately and credibly explained why he made
the prior statements and gave the prior testimony." D. Ct.
Order p.3 (R. 85, p.3).

The defendant argues that the evidence is "manifestly
against such a ruling" Def. Br. p.18. and that "there is an
abundance of evidence that controverts the district court's

finding that Officer Mitchem was entirely credible, that he adequately explained his prior inconsistent statements and testimony, and that his testimony was corroborated by the other government witnesses." Def. Reply Br. p.21. But none of these attacks meets the standards set forth for overcoming a credibility determination by a district court judge. Such a determination cannot be disturbed on appeal "unless it is completely without foundation." *United States v. Freeman*, 691 F.3d 893, 900 (7th Cir. 2012). "Testimony is not incredible as a matter of law … only because the witness may have been impeached by certain discrepancies in [her] story, by prior inconsistent statements, or by the existence of a motive to provide evidence favorable to the government." *Id.* at 900. To find a witness's testimony to be incredible as a matter of law, it must have been "physically impossible for the witness to have observed that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all." *United States v. Taylor*, 701 F.3d 1166, 1174 (7th Cir. 2012). We stress that we do not take our review of the inconsistencies lightly. As we noted before, we emphasize that a trial judge cannot "insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness." *Anderson*, 470 U.S. at 575. "But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Id.*

Indeed Officer Mitchem's statements and testimony were not entirely consistent. On the night of the seizure, Officer

Mitchem filled out a complaint for a search warrant that stated that when the garage door opened, "Soto was standing in the garage holding a large white shopping bag, with another male, since identified as Luis Contreras. When officers approached, Soto immediately dropped the bag, and officers could see items inside the bag which, consistent with their expertise and training, were multi-kilograms of narcotics." (R. 51-1, p.2) (pageID 109).

Seven hours later, Officer Mitchem drafted his supplementary report in which he stated that he observed Soto "engage in a hand to hand narcotics exchange with another Hispanic male. Soto dropped a box to the ground and a large white object, which was wrapped in clear plastic, fell out. Soto picked the object up and placed it back into the shoe box." (R. 53-2, p.1) (pageID 122). Then about a month later, Mitchem testified before the grand jury that Soto removed a white bag from the back of the vehicle, and, as he walked toward the Mercedes, the bag broke and fell to the ground, revealing a shoebox from which two rectangles, wrapped in clear plastic, fell out. Def. Br. App. pp.26-27.

On June 11, 2011, Officer Mitchem met with a DEA agent and the assistant U.S. attorney to file a supplemental report of the investigation. This report stated that Mitchen saw Soto retrieve from the rear of his van, a Nike shoebox which gave way revealing a one-kilogram sized package of presumptive narcotics. Mitchem then saw Soto place the shoebox into a plastic bag. (R. 53-3, p. 2) (pageID 125).

At the evidentiary hearing on April 26, 2012, Mitchem testified that a minute or two after the garage opened, he observed Soto grab an orange shoebox with grey tape on it from inside the minivan. He then stated that "the box that

[Soto] was carrying gave way. It fell to the ground. When it fell to the ground, I observed a rectangular-shaped object wrapped in plastic with a white content fall out of the box." (R. 90, p.75) (pageID 590). Then, he continued, Soto picked up the box, returned to the minivan, and placed the box and its contents into a tan plastic bag. *Id.* at 75-76 (pageID 590-91).

Although Contreras never specifically sets forth the exact inconsistencies that he believes are so damning to Mitchem's credibility, we can surmise that he believes the changes from the white bag to the tan bag and whether and if the shoebox was in the bag when it dropped are significant. In order to explore the inconsistencies, we simplify the various descriptions in the statements and testimony as follows:

1. The search warrant: Soto was holding a large white shopping bag which he dropped revealing items that looked like narcotics;

2. The supplementary report: Soto dropped a box to the ground and a large white object, which was wrapped in clear plastic fell out. Soto picked the object up and placed it back into the shoe box;

3. The grand jury testimony: Soto removed a white bag from the back of the vehicle, and as he walked, the bag broke, revealing a shoebox from which two rectangles, wrapped in clear plastic, fell out;

4. DEA Report: Soto removed a Nike shoebox from the back of his van, which gave way revealing a one-kilogram sized package which Soto put into a plastic bag.

5. The evidentiary hearing: While Soto was carrying an orange shoebox, the box gave way and fell to the ground re-

vealing a rectangular shaped object wrapped in plastic with a white content, all of which Soto picked up and placed into a tan plastic bag.

It is true that the details surrounding the container of the narcotics vary slightly from iteration to iteration, but the district court was entitled to conclude that the variations were not significant nor even contradictory. The tan bag, for example, appears to be a very light tan in the exhibits and therefore easily confused for white. (*See* R. 188-4, 188-5, 188-6) (PageID 2358-60). Officer Mitchem also explained that he confused the tan bag found outside with a white bag containing narcotics found inside the house. In some descriptions the bag falls. In some the box falls. In some the description of the bag is omitted. Officer Mitchem gave his most through explanation at the time of the evidentiary hearing. He also then explained his prior inconsistencies by stating that previously he may have confused the order in which things happened, thinking that Soto first placed the box into the bag before the drop, but then realizing that Soto placed the contents into the bag after they dropped. Some descriptions were merely incomplete rather than inconsistent. And in any event, they were not so inconsistent as to require the district court to conclude, as a matter of law, that Officer Mitchem was not telling the truth at the evidentiary hearing.

Contreras also makes much ado about Officer Mitchem's testimony that the shoebox gave way and crumpled as it hit the garage floor. Contreras argues that the tape wrapped around the shoebox in the exhibits does not appear to be stretched or torn in a manner consistent with the box giving way. Instead, he notes, it was clearly cut by a sharp item like a knife or razor blade. Indeed this appears to be supported

by the photographic evidence (R. 188-5) (pageID 2359). All of the officers testified that they did not cut the shoebox open. Contreras does not explain why he believes it was the officers rather than Soto or Contreras who cut the box open. In fact, it seems just as plausible, or at least equally so, that Contreras or Soto cut the tape so that the drugs could be inspected before the exchange. In the end, neither our speculation nor Contreras' matters, as the district court was entitled to believe the testimony of the officers that they did not sever the duct tape.

Contreras also points to other inconsistencies in his attempt to deem the testimony inconsistent and improbable. First, he points to discrepancies between what Mitchem claims to have said on the radio and what other officers recalled hearing. If, however, the district court judge was able to believe that Mitchem saw narcotics in plain view and entered the garage to preserve the evidence and arrest the subjects before both were out of reach, then the testimony about who said what and when over the radio is irrelevant. Once Mitchem entered the garage on legitimate grounds, the other police officers were entitled to follow suit as back-up whether they knew the reason for Mitchem's entrance or not. Moreover, our review of the testimony did not reveal any material inconsistencies in the accounts of the radio transmissions. For example, Officer Mitchem claims that after he described the drugs in plain view, he heard someone, other than himself, on the radio, say "go, go, go." (R. 90, p. 76) (pageID 591). Officer Briones testified that he heard Officer Mitchem say "move in." (R. 90, p.200) (pageID 715). Eichman could not understand anything on the radio at all. (R. 90, p.173) (pageID 688). Police radio transmission can, in fact, be garbled and difficult to attribute to particular speak-

ers. A district court could certainly find these facts to be immaterial, or even not contradictory at all.

Next Contreras expresses skepticism about why Officer Mitchem only took a single photograph "of the objects giving rise to probable cause that could remotely corroborate his story." Def. Brief p.24. But this is factually untrue. As Officer Mitchem explained at the evidentiary hearing, he took three pictures of the narcotics that formed the basis of the search, in their various containers— two wider angle photographs of the bag with the shoebox inside and one close up with the buckled and open shoebox visible. *See also* (R. 90, pp.134-35) (pageID 649-50). Those three pictures appear in the record at R. at 188-4, 188-5, 188-6. (pageID 2358-2360).

Finally, Contreras points to Officer Eichman's testimony about bumping into the back of the Mercedes as he turned the corner into the garage. Contreras claims that if Eichman's testimony were true, he would have fallen into the trunk of the car —a fact that he certainly would remember but about which there was no testimony. But of course we have no information about how quickly Eichman was moving at the moment he turned the corner into the garage and whether physics would necessitate that he consequently fall into the open hatch. This argument carries no weight and neither adds to nor detracts from the veracity of Mitchem's reasons for entering the garage. Finally, Contreras argues that his sister-in-law was never in the garage as Mitchem claimed, a controverted fact we discuss in more detail below.

In the end, there is nothing inherently implausible about Officer Mitchem's story as backed up by the other officers: Soto and Contreras met to exchange money for drugs. The drugs were in one car and needed to be transferred to the

other, but neither could open the rear hatchback without first opening the garage. Once the garage door was opened, Officer Mitchem had a clear view of Soto carrying the drugs, which at some point dropped to the ground in a manner that made them visible to Officer Mitchem. The story is not so implausible, nor the reports and testimony so inconsistent, that no reasonable factfinder could believe it. *Anderson*, 470 U.S. at 575.

It is true that cases in which defendants drop drugs in plain view invite skepticism. Indeed, after the exclusionary rule in *Mapp v. Ohio*, 367 U.S. 643 (1961), legal scholars started to notice an increase of "dropsy" cases in which police began to testify that rather than recovering narcotics on the defendant's person, the defendant "dropped" the narcotics to the ground in plain view. *See United States v. Janis*, 428 U.S. 433, 447, n.18 (1976) (citing scholarly articles on the influx of "dropsy" cases following *Mapp*). Skepticism, however, "does not suffice to supersede the trial court's credibility determination." *Rice v. Collins*, 546 U.S. 333, 342-43 (2006). And in fact, the defendant had five kilograms (over eleven pounds) of cocaine packed into a shoebox designed to hold under one pound of athletic shoes. It is not beyond the laws of nature to believe that the box buckled and fell to the ground revealing drugs in plain view. In fact, in the photographs in the record, the box does appear to have buckled in just this way. (R. 188-5, p.1) (PageID 2359).

The district court considered and rejected all of the arguments regarding the factual inconsistencies finding that, "[t]o the extent Contreras pointed to inconsistencies in prior statements and testimony by Agent Mitchem, Agent Mitchem adequately and credibly explained why he made

the prior statements and gave the prior testimony." D. Ct. Order, p.3. (R. 84 p.3). The district court's reasoned credibility determination cannot be overturned by this court.

The district court did not err when it found that the officer's initial entry into the garage was not an unreasonable search and seizure under the Fourth Amendment.

**B.    The warrantless search of the residence.**

**1.  The protective sweep.**

Although we have determined that the entry into the garage was lawful, Contreras also asks us to review the district court's determination that the search of the rest of the house did not violate the Fourth Amendment. Contreras signed a consent to search the house, but at the suppression hearing claimed that his consent was coerced by the initial entry and protective sweep of the house. The officers did not uncover any evidence during that protective sweep, and so, as the defendant concedes, the only relevance of the protective sweep is whether it affected the voluntariness of Contreras' consent. The district found that it did not, and we agree. Neither the initial entry displaying force nor the protective sweep was inherently coercive.

The Supreme Court has determined "that searches and seizures inside a home without a warrant are presumptively unreasonable." *Kentucky v. King*, 563 U.S. 452, 459 (2011), (*quoting Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) and *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). But because the constitution prohibits only unreasonable searches and seizures, the warrant requirement is subject to certain reasonable exceptions. *King*, 563 U.S. at 459. Those exceptions in-

clude, among other things, exigent circumstances and protective sweeps. In the latter case, officers may take steps to

> assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack … [A]n in-home arrest puts the officer at the disadvantage of being on his adversary's "turf." An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.

*Maryland v. Buie*, 494 U.S. 325, 333 (1990). Therefore the officers could lawfully enter Contreras' house for a protective sweep if it was a "properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 337. But the search is not unlimited—it may not include "a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep must last no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises. *Id.* at 335-36.

Officer Mitchem testified that when he entered the garage he saw "a woman standing in the rear of the garage on top of the stairs that leads back into the house," and that when the other officer arrived, he yelled out "somebody is at the back of the garage." (R. 90, pp.77, 145) (pageId 592, 660). Briones described entering the garage and immediately hearing someone call out "door, door," and also hearing rustling

from within the house. (R. 90, pp.201, 218) (pageID 716, 733). Contreras' sister-in-law testified that she never entered the garage, but the district court judge credited the officer's testimony over hers. D. Ct. Order, p.3. (R. 85, p.3). Briones had sufficient articulable facts to allow for a protective sweep. And if he alone did not, under the collective knowledge doctrine, the court will attribute knowledge known to one officer to the others. *United States v. Gary*, 790 F.3d 704, 706 (7th Cir. 2015).

Contreras cites a district court case for the premise that an arrest in a garage does not automatically allow an officer to make a protective sweep of the residence. *United States v. Barrera-Martinez*, 274 F. Supp. 2d 950, 964 (N.D. Ill. 2003). But in addition to having no binding precedent on this court, in *Barrera-Martinez*, the arrest took place in a garage outside of an apartment building where the suspect's residence was inside another building and two floors away. *Id.* These facts are far different. The garage here was attached internally to the house. Access to the house from the garage and vice versa was as easy as opening a door, and in this way no different than access between a bedroom and a hallway inside the house proper. Having heard the presence of another person, the police were entitled to sweep the house for their own protection.

The protective sweep lasted less than a minute. The officers did not search any drawers, containers, or other places for evidence, but merely looked for people so that they could ensure officer safety. They found only Contreras' sister-in-law in the house. The sweep itself was well within the bounds of the Fourth Amendment. In this way the case upon which Contreras relies, *Robles-Ortega*, 348 F.3d 679, 680 (7th

Cir. 2003), is readily distinguishable as the police forcefully and illegally entered the apartment before asking the defendants to sign a consent form. The district court found, and we concur, that neither the entry into the garage nor the protective sweep were illegal.

Contreras complains that the district court failed to consider whether the officers' initial warrantless entry into his house violated the Fourth Amendment. The district court did, however, declare that "Contreras has not shown that the written consent was obtained by coercion or any unlawful means, nor that it was the product of an illegal search." D. Ct. Order at 7. (R. 85, p.7). And after all, even had the protective sweep been illegal, if it did not coerce Contreras into signing a consent form, then it would have created no harm to him, as the officers did not uncover any contraband during the protective sweep. Nevertheless, as we have just demonstrated, the search was not illegal. Nor did it coerce Contreras to sign a consent form—as we conclude in the following section below.

### 2. Voluntariness of the confession.

The voluntariness of a consent to search is a factual determination that this court reviews for clear error. *Ohio v. Robinette*, 519 U.S. 33, 40 (1996). Once again, we defer to the credibility findings of the district court. *United States v. Groves*, 530 F.3d 506, 513 (7th Cir. 2008). The government bears the burden of demonstrating by a preponderance of the evidence that consent to search was in fact voluntarily given, and not the result of duress or coercion, express or implied. The Government bears the burden of proving that consent freely and voluntarily was given. *United States v. Johnson*, 495 F.3d 536, 541 (7th Cir. 2007). To determine

whether a defendant voluntarily consented, a district court should consider "the totality of the circumstances, including [the defendant's] age, education and intelligence; whether he was advised of his constitutional rights; how long he was detained prior to consent; whether he consented immediately or after police made several requests; whether the police used physical coercion; and whether he was in custody." *United States v. Ruiz*, 785 F.3d 1134, 1146 (7th Cir. 2015).

The district court noted that the officers advised Contreras of his constitutional rights, that Contreras immediately offered to cooperate with the officers, that his handcuffs were removed and he signed a consent form. D. Ct. Order, p.6 (R. 85, p.6). Although the district court's analysis is brief, we also note that Contreras was close to forty years old at the time and speaks and understands both English and Spanish. Contreras was detained only a short time and consented immediately after the initial request. He also stated that he had the experience of cooperating with the police in the past and thus we can surmise that he understood the nature of consenting to a search and the ability to assess the benefits of cooperating as opposed to remaining silent. (R. 90, p.79) (pageID 594).

Contreras signed two consent forms—one in English and one in Spanish.[4] The consent form stated, "I have not been threatened, nor forced in any way. I freely consent to this search." (R. 51-3) (pageID 112). He spoke freely with the officers, described his drug dealings with Soto, and directed

---

[4] The Spanish language consent form contained the wrong address, but Contreras has never, in either the district court or in this court, raised that as an issue affecting the voluntariness of his consent.

the officers where to successfully find the narcotics, drug
proceeds and firearms, including directions on how to open
the safe. The evidence more than adequately supports the
district court's finding of fact that Contreras' consent to
search was voluntary.

Contreras argues that the forcefulness of the entry into
the garage in combination with the protective sweep vitiated
Contreras' ability to freely consent to a search of the house.
In *United States v. Taylor*, 31 F.3d 459, 463-64 (7th Cir. 1994),
we rejected just such an argument explaining,

> The record shows that the initial melee of
> agents, badges and weapons, necessary to pro-
> tect the safety of the agents and the confiden-
> tial informant, dissipated only seconds after it
> had begun and that all was routine once the
> premises had been secured. Though certainly
> unpleasant, there is nothing so inherently coer-
> cive about such tactics, commonly used where
> a danger to life or limb is perceived by law en-
> forcement agents, to render subsequent coop-
> eration involuntary.

*Id.* In short, an initial display of force is not inherently coer-
cive. *See, e.g., United States v. LaGrone*, 43 F.3d 332, 333-34
(7th Cir.1994) (nineteen-year-old voluntarily consented to
search even after officers wearing raid masks entered the
store with weapons drawn, held the defendant in custody
for fifteen minutes prior to obtaining consent, and asked
more than once whether the defendant would consent to a
search of the store); *United States v. Kozinski*, 16 F.3d 795, 810
(7th Cir. 1994) (consent deemed voluntary where agents en-
tered the defendant's home with an arrest warrant, one of

the agents held a gun to the defendant's side for the first few minutes of the arrest, and the agent then holstered her gun after the defendant was handcuffed but before he provided written consent); *United States v. Rojas*, 783 F.2d 105, 107–10 (7th Cir. 1986) (consent deemed voluntary where seven officers came to the defendant's apartment to arrest him, displayed their weapons upon arrival, took the defendant into custody, handcuffed him, and then sequestered him in a small bathroom before requesting his consent); *United States v. Kimoana*, 383 F.3d 1215, 1226 (10th Cir. 2004) ("the actions of the officers in sweeping the room with guns drawn and patting down the occupants" although intimidating did not vitiate consent when the officers had holstered their weapons and the atmosphere was calm at the time the consent was given).

Although the officers approached the house quickly and forcefully, the heat of the situation de-escalated quickly. The defendant, immediately, upon his arrest stated that he wanted to cooperate. (R. 90, p. 79) (pageID 594). Within a minute or two of entering the garage and handcuffing the men, the officers helped the men up and brought them to the rear of Officer Mitchem's van while the remaining officers finished the protective sweep. (R. 90, p.79-80) (pageID 594-95). And then just a few minutes later, officers brought Contreras into the house, removed his handcuffs and allowed him to sit in the dining area while they asked him some questions. (R. 90, pp.94, 204) (pageID 609, 719). The initial show of force dissipated quickly and completely.

The district court did not err by finding, based on these facts, that Contreras' consent was voluntarily given. We therefore conclude that neither the entry to the garage nor

the protective sweep of the house were illegal and Contreras's consent to search was freely given. Consequently, the ruling of the district court is AFFIRMED.