In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 15-3453 & 16-4152

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

EURIPIDES CAGUANA,

*Defendant-Appellant.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:13-cr-00823-1 — **Thomas M. Durkin**, *Judge.*

ARGUED NOVEMBER 9, 2017 — DECIDED MARCH 8, 2018

Before RIPPLE, MANION, and SYKES, *Circuit Judges.*

RIPPLE, *Circuit Judge.* A grand jury charged Euripides Caguana with four counts of using a facility of interstate commerce with the intent that the murder-for-hire of two individuals be committed, in violation of 18 U.S.C. § 1958(a). After a five-day trial, the jury rejected Mr. Caguana's entrapment defense and found him guilty on all counts. The district court sentenced him to a total of 210 months' imprisonment and one year of supervised release.

After filing a timely appeal of his convictions and sentence, Mr. Caguana filed a motion in the district court under Federal Rule of Criminal Procedure 33, requesting a new trial based on newly discovered evidence. We ordered a limited remand. *See* Fed. R. App. P. 12.1.[1] After a full evidentiary hearing, the district court denied the motion for a new trial. Mr. Caguana timely appealed from that ruling.[2] We consolidated his two appeals.

We now affirm the judgments of the district court. Mr. Caguana's challenges to the sufficiency of the evidence, with respect to both his intent to pay for a murder-for-hire and his entrapment defense, fail as a matter of law. Our case law clearly forecloses his argument that the intent element of § 1958(a) requires a legally binding contract. Here, there was sufficient evidence that Mr. Caguana had the requisite intent that a murder-for-hire be committed. The jury was entitled to credit the testimony of the informant and to make reasonable inferences from the evidence, which included a number of recorded conversations introduced by the Government.

The evidence also was sufficient to permit the jury to reject Mr. Caguana's entrapment defense. The district court thoroughly examined this matter in adjudicating Mr. Caguana's

---

[1] Under Federal Rule of Appellate Procedure 12.1, if a timely motion is made in district court for relief that the court lacks authority to grant because an appeal has been docketed and is pending, and the district court states that the motion raises a substantial issue, the court of appeals may remand for further proceedings while retaining jurisdiction. Fed. R. App. P. 12.1.

[2] Although Mr. Caguana appealed this ruling, he has not challenged it in his submissions to us. Therefore, as explained later in this opinion, our review is largely limited to the original trial record.

motion for a new trial, and Mr. Caguana does not meaning-
fully challenge the denial of that motion on appeal. Based on
the existing trial record, we are convinced that the jury acted
reasonably in finding that Mr. Caguana was not entrapped by
a government agent.

Mr. Caguana's challenge to his sentence must also fail. The
district court followed the plain wording of the applicable
guidelines provisions and correctly applied those provisions
to the facts of this case. There is no question that the sentence
is substantively reasonable.

# I

# BACKGROUND

## A. Facts[3]

In June 2011, the State of Illinois charged Mr. Caguana's
seventeen-year-old son with murder, attempted murder, and
firearms offenses. Two of his son's friends, who were arrested
in connection with the same incident, became state witnesses
against his son. Mr. Caguana believed the trial would begin
in fall 2013. On October 8, 2013, Mr. Caguana called a long-
time acquaintance, James Valentin,[4] and told him that he
wanted to find a hit-man to kill the two state witnesses. Val-

---

[3] We present the facts in the light most favorable to the prosecution, alt-
hough we occasionally note where certain facts were disputed at trial.

[4] The parties disputed the nature of the relationship between Valentin and
Mr. Caguana. Valentin said he spoke with the defendant about once a
month and did occasional plumbing jobs for him; Mr. Caguana described
Valentin as a trusted friend for many years.

entin then contacted a detective with the Chicago Police Department, Jerry Pentimone, and informed him of Mr. Caguana's plan. Valentin had known Detective Pentimone for a long time. Valentin had acted as a "John Doe" for Detective Pentimone in more than twenty narcotics, weapons, and gang-related search warrants. He testified at trial that neither Detective Pentimone nor the Chicago Police Department compensated him or gave him any benefit in exchange for the information he had provided over the years.

On October 15, 2013, Valentin met with Mr. Caguana at a restaurant in Chicago to discuss the murder-for-hire. Mr. Caguana reiterated his plan and showed Valentin photographs of the two target witnesses as well as handwritten notes he had taken about the witnesses' daily movements and whereabouts. Valentin testified that during that meeting, Mr. Caguana offered to pay $7,500 for the double homicide—$5,000 for the first murder, $2,000 for the second murder, and $500 for a gun. According to Valentin, Mr. Caguana also promised to give Valentin's son a Cadillac Escalade once the plan was completed.

Immediately following this meeting, Valentin relayed the updated information to Detective Pentimone, who then contacted the Federal Bureau of Investigation. Special Agent Lora Richardson met with Valentin and Detective Pentimone that same day, and the FBI decided to join the Chicago Police Department in investigating Mr. Caguana. At the direction of the FBI, Valentin called Mr. Caguana and, in a recorded conversation, conveyed that he had found a hit-man and needed money to compensate him. Mr. Caguana told Valentin to come to his garage so they could sort out the details.

Mr. Caguana ended the conversation by saying "We're gonna do it. We're gonna do it."[5]

Later that same day, Valentin met Mr. Caguana at his garage; he wore a body wire, but the wire malfunctioned and did not record. During the meeting, Mr. Caguana gave Valentin $500 to purchase a gun and drove Valentin around to show him where the witnesses lived. They made plans to meet the next morning along with the hit-man whom Valentin had procured.

On October 16, 2013, Mr. Caguana met with Valentin and Officer Jose Almanza (who was posing as a hit-man) at Chase Park in Chicago. They met in Valentin's car, and the conversation was recorded. They discussed details of the plan, including which witness would be killed first, as well as compensation for the murders. Mr. Caguana said he could "go to [his] house, … get the five thousand to get this guy," and that "[r]ight now is five thousand and then … the seven thousand five hundred."[6] Officer Almanza left the meeting with the understanding that Mr. Caguana was planning to give him a $2,000 down payment later that day.

Special Agent Richardson and Detective Pentimone arrested Mr. Caguana as he exited Valentin's car. Mr. Caguana

---

[5] R.114 at 167.

[6] R.167 (transcript of audio recording at 8–9, available in the case file). Valentin understood Mr. Caguana as indicating that he would pay $5,000 for the first murder, $2,000 for the second murder, and $500 for the gun, which they had discussed earlier.

told them that he had been discussing a sewer job with Valentin, which was clearly controverted by the recording. Mr. Caguana was taken into custody and denied bond.

## B. District Court Proceedings[7]

A grand jury indicted Mr. Caguana in a four-count, second superseding indictment with using facilities of interstate commerce with the intent that a murder-for-hire be committed, in violation of 18 U.S.C. § 1958(a). After a trial in May 2015, the jury found him guilty on all counts. Mr. Caguana filed a motion for a judgement of acquittal or new trial, contending that the evidence was insufficient as a matter of law to uphold his convictions. The district court denied the motion. It sentenced Mr. Caguana to concurrent sentences of 105 months each on Counts 1 and 2, to run consecutively with concurrent sentences of 105 months each on Counts 3 and 4. In addition to this 210-month sentence, Mr. Caguana received one year of supervised release.

During the trial, Mr. Caguana argued that Valentin had unlawfully induced him to enter the murder-for-hire plot. He argued that, given this inducement, he was entitled to an entrapment defense. The Government argued in response that Mr. Caguana was predisposed to commit the offense, that he was not induced by Valentin, and that, in any event, Valentin

---

[7] The jurisdiction of the district court is premised on 18 U.S.C. § 3231.

was not acting as a government agent at the time of the al-
leged entrapment. The district court instructed the jury on en-
trapment,[8] but the jury rejected the entrapment defense.

_____

[8] The jury instruction on entrapment read:

> The government has the burden of proving beyond a
> reasonable doubt that the defendant was not entrapped
> by Mr. Valentin in this case. In order to find that defend-
> ant was not entrapped as a result of Mr. Valentin's alleged
> actions, you must find, beyond a reasonable doubt, that
> either:
>
> 1.  The defendant was predisposed to commit the crime
>     charged in the indictment; or
>
> 2.  The defendant was not induced by Mr. Valentin to
>     commit the charged crimes; or
>
> 3.  At the time defendant claims to have been induced,
>     Mr. Valentin was not acting as an agent of the gov-
>     ernment with respect to his interactions with the de-
>     fendant.
>
> If you do not unanimously find beyond a reasonable
> doubt that the defendant was:
>
> 1.  predisposed to commit the crime charged in the in-
>     dictment, or
>
> 2.  not induced by Mr. Valentin to commit the charged
>     crimes,
>
> then you must decide whether, at the time the defendant
> claims Mr. Valentin induced him to commit the charged
> crimes, Mr. Valentin was acting as an agent of the govern-
> ment with respect to his interactions with the defendant.

R.86 Instruction Number 19.

After sentencing, Mr. Caguana filed a timely appeal,[9] challenging the sufficiency of the evidence and the calculation of his sentence. However, before full appellate briefing, he filed a motion for a new trial in the district court pursuant to Federal Rule of Criminal Procedure 33. He claimed that newly discovered evidence warranted a new trial, and alleged that Valentin had a long history of working with, and receiving benefits from, the Chicago Police Department in exchange for information about criminal activity. If true, that allegation would mean that Valentin committed perjury during the trial when he testified that he was not a paid informant and was not compensated by the Chicago Police Department for providing information.

We granted a limited remand based on the district court's view that the motion raised a substantial issue and warranted further proceedings. On remand, the district court approved the appointment of a private investigator, authorized the issuance of numerous subpoenas, and conducted a full evidentiary hearing regarding Valentin's relationship with the Chicago Police Department. Ultimately, the court determined that the new evidence was insufficient to warrant a new trial and denied Mr. Caguana's Rule 33 motion.[10] Mr. Caguana

---

[9] The jurisdiction of this court is premised on 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

[10] The district court explained its reasoning at the close of the post-trial evidentiary hearing. *See* R.160 at 200–09. As the court explained, it held the hearing in response to newly discovered evidence suggesting that Valentin was paid by, or received benefits from, the Chicago Police Department in exchange for his tips about criminal activity. Valentin's siblings had contacted Mr. Caguana's attorney, alerting him to a cozy and lucrative relationship between their brother and the police department. If true,

timely appealed that judgment, and we consolidated it with his previous appeal.

Mr. Caguana now challenges the sufficiency of the evidence in the jury trial, the district court's handling of his entrapment defense, and the calculation of his sentence. Although his second appeal concerned the district court's denial of his Rule 33 motion, his briefs are devoid of any challenges to that judgment.

## II

## DISCUSSION

### A.

We first examine Mr. Caguana's submission that the evidence in the record is legally insufficient to support his convictions. A challenge to the sufficiency of the evidence can be successful only when, after viewing the evidence in the light most favorable to the prosecution, we nevertheless are convinced that no rational jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Maloney*, 71 F.3d 645, 656 (7th Cir. 1995). In this evaluation, we do not "weigh the evidence, make credibility determinations, or resolve testimonial inconsistencies." *United States v. Webber*, 536 F.3d 584, 597 (7th Cir. 2008) (citations omitted). Given these

---

their testimony would contradict the trial testimony of both Valentin and Officer Pentimone. The district court evaluated the testimony of Valentin's siblings at the post-trial hearing and found it to be biased and untruthful. *See id.* at 202–04 (describing the witnesses as "incomprehensible," "nonresponsive," and "internally inconsistent"). At bottom, the court determined that the new evidence was merely collateral impeachment and did not warrant a new trial. *Id.* at 205, 207, 210.

restrictions on our review, Mr. Caguana, like all defendants making this argument, "bears a heavy burden." *United States v. Gibson*, 530 F.3d 606, 612 (7th Cir. 2008) (internal quotation marks omitted).

Mr. Caguana was charged under 18 U.S.C. § 1958(a), the federal murder-for-hire statute, which reads as follows:

> Whoever travels in or causes another … to travel in interstate or foreign commerce, or uses or causes another … to use … any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned … .

18 U.S.C. § 1958(a). As we have explained, this offense encompasses two elements: "(1) traveling in, or using a facility of, interstate or foreign commerce, or causing another person to do so, (2) with the intent that a murder for hire be committed." *United States v. Dvorkin*, 799 F.3d 867, 875 (7th Cir. 2015). Notably, the second element requires "intent that a murder be committed … *as consideration for* the receipt of, or *as consideration for* a promise or agreement to pay, anything of pecuniary value." 18 U.S.C. § 1958(a) (emphasis added).[11]

---

[11] The statute defines "anything of pecuniary value" as "anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage." 18 U.S.C. § 1958(b)(1).

The parties stipulated to the interstate-commerce element, but they disagree on the requirements and satisfaction of the intent element. Mr. Caguana contends that the Government failed to prove the requisite intent because it failed to prove that he promised or agreed to pay something of pecuniary value "*as consideration for*" the murders. Mr. Caguana makes a number of analytically imprecise arguments about the absence of evidence that he gave such consideration. Mr. Caguana suggests that his provision of a gun to the informant and their "just talking about a potential murder for hire" do not amount to "giving something of pecuniary value" in exchange for the murders.[12] He also intimates that the informant facilitated all of the offers to the hit-man and that the informant's actions do not demonstrate Mr. Caguana's intent. Finally, Mr. Caguana points us to provisions of the Uniform Commercial Code governing offers and acceptances in the sale of goods. In essence, he argues that he and the hit-man must have entered into an actual *contractual* arrangement. All of these arguments are foreclosed by our opinion in *Dvorkin*, coupled with the jury's reasonable interpretation of the evidence at trial.

Although we have said that § 1958 requires a "quid-pro-quo between the solicitor and the murderer," we clearly have held that "the word 'consideration' does not import all of contract law." *Gibson*, 530 F.3d at 610 (internal quotation marks omitted).[13] We also have explained that "the statutory phrase

---

[12] Appellant's Br. 8.

[13] In *United States v. Gibson*, 530 F.3d 606, 611 (7th Cir. 2008), we rejected counterarguments based on *United States v. Wicklund*, 114 F.3d 151 (10th Cir. 1997).

'consideration for a promise or agreement to pay' does not create a separate 'agreement element,' but rather modifies the type of intent which a defendant must possess, namely, the intent to commit a murder for hire." *Dvorkin*, 799 F.3d at 875–76. Accordingly, the Government need not prove an actual murder-for-hire agreement. It must prove only that Mr. Caguana had the *intent* that a murder-for-hire be committed. *Id.* at 878. Despite this clear precedent, Mr. Caguana argues that under the Uniform Commercial Code, any promise he made did not amount to legally binding consideration. But § 1958(a) does not require proof of an actual murder-for-hire agreement. *Id.*

Once we strip away Mr. Caguana's failed claim that § 1958 requires proof of an actual contract, we are left with the question of whether the Government proffered sufficient evidence of his intent that a murder-for-hire be committed. Intent is often established by circumstantial evidence, and the Government provided a good deal of such evidence here. Specifically, it presented evidence that Mr. Caguana gave $500 to Valentin to purchase a gun for the murders, tracked the victims' movements and gave his surveillance notes to Valentin, interviewed a potential hit-man, suggested the order of the hit list to the hit-man, offered to pay $7,000 for the completed double homicide (with $2,000 as a down payment), and promised to give Valentin's son a Cadillac Escalade as compensation for Valentin's help facilitating the plot.

Despite all of this evidence, Mr. Caguana claims that, as a matter of law, it does not show that he intended to "promise or agree[] to pay[] anything of pecuniary value" in exchange for the murders. He emphasizes that most of this evidence comes from Valentin's testimony and that Valentin is not a

credible witness. It was quite proper for Mr. Caguana to argue that Valentin's motives and history as a police informant made his testimony unworthy of belief, but we certainly cannot say that his testimony was "so unbelievable that no reasonable factfinder could credit" him. *United States v. Contreras*, 820 F.3d 255, 263 (7th Cir. 2016).

Mr. Caguana had, moreover, a full opportunity to attack Valentin's credibility during the jury trial. Despite his efforts, the jury credited Valentin's testimony, and the district court did not find sufficient evidence of perjury by Valentin to warrant a new trial (a finding which Mr. Caguana does not challenge on appeal). As we noted earlier, defendants who challenge the sufficiency of the evidence supporting a jury verdict face an uphill battle, and "nowhere is this more true than when it comes to credibility determinations." *Id.* We are not entitled to second-guess the jury's assessment of Valentin's credibility unless his testimony was "internally inconsistent, implausible, or contradicted by extrinsic evidence." *Id.* That certainly is not the case here.

Independently of Valentin's damning testimony, the Government provided additional evidence demonstrating that Mr. Caguana intended to reward the murders. The jury heard recorded conversations among Mr. Caguana, Valentin, and Officer Almanza (posing as a hit-man) discussing the murder-for-hire. Although these conversations involved a number of veiled terms—such as "[h]e gonna throw you a chop"[14] and "[h]ow much bread you got?"[15]—the jury was entitled to infer criminal intent from such language. We have noted that

---

[14] R.114 at 238; R.116 at 627.

[15] R.114 at 242.

"[c]riminals have a way of agreeing and conspiring through the use of code language, which clearly imparts their intentions while hoping to hide their meaning from law enforcement." *Gibson*, 530 F.3d at 610. That is precisely why § 1958(a) does not require proof that the solicitor and murderer make an agreement "as clear as businessmen might." *Id.*

And the conversations were not always that ambiguous. At one point in a recorded conversation, Mr. Caguana told Officer Almanza, "if you want we can go there and do this guy here and then I give you, I'll go to my house, boom boom I get, I get the $5,000 to get this guy."[16] Mr. Caguana claims that he said this out of fear of the hit-man, but the jury was entitled to disbelieve his explanation and to credit this rather direct evidence that he intended to compensate the murders.[17] Accordingly, Mr. Caguana's submission that the evidence of record is legally insufficient to support his convictions must fail.

## B.

Mr. Caguana next contends that the district court's instruction on entrapment was erroneous and that the court

---

[16] R.116 at 632.

[17] Mr. Caguana also argues that the fact that he gave Valentin $500 to purchase a gun does not prove that he intended to compensate anyone for the murders, because giving an informant money for a weapon does not equate to paying for a murder. We need not decide whether this $500 payment proved Mr. Caguana's intent to remunerate the murders, since the Government presented separate evidence that he offered to pay $7,000 for the murders themselves.

should have granted his motion for a judgment of acquittal or new trial on that ground.[18]

We review de novo whether a district court's jury instructions "fairly and accurately summarize the law." *Webber*, 536 F.3d at 599 (internal quotation marks and alteration omitted). However, "[t]he right to object to jury instructions on appeal is waived if the record illustrates that the defendant approved of the instructions at issue." *United States v. Griffin*, 84 F.3d 912, 924 (7th Cir. 1996).

The district court's entrapment instruction allowed the jury to reject the entrapment defense if the Government proved beyond a reasonable doubt that Valentin was "not acting as an agent of the government" at the time of the alleged inducement.[19] In Mr. Caguana's view, this instruction improperly lowered the Government's burden of proof. However, Mr. Caguana approved the entrapment instruction in district court[20] and consequently waived this ground for appeal. *See id.* In any event, we see no merit at all to his contention. It is well established that "[t]here is no defense of private entrapment." *United States v. Morris*, 549 F.3d 548, 551 (7th Cir. 2008). Therefore, if Valentin was acting as a private individual

---

[18] The Government suggests that Mr. Caguana has waived his challenge to the entrapment instruction for lack of development in his opening brief. *See* Government's Br. 30 n.4 (citing *United States v. Smith*, 831 F.3d 793, 803 (7th Cir. 2016)). Despite any shortcomings in Mr. Caguana's briefs, we decide this issue on other grounds given the clear outcome in the Government's favor.

[19] R.86 Instruction No. 19.

[20] *See* R.116 at 658–59 (approving instruction number nineteen at instruction conference).

rather than an agent of the Government, Mr. Caguana's entrapment defense fails. The district court's instruction fairly and accurately captured the distinction between private "vigilantism" and entrapment by state agents, only the latter of which is a defense to criminal charges. *Id.* at 550–51. It did not reverse or reduce the Government's burden of proof.

Mr. Caguana also argues, albeit obliquely, that there was insufficient evidence for the jury to find against his entrapment defense. He contends that "Valentin cannot keep his story straight," and that Valentin's testimony regarding his relationship to the Chicago Police Department was "nonsense."[21] Valentin's history as a police informant certainly gave the defense a ground upon which to challenge the credibility of his account. Indeed, defense counsel cross-examined Valentin at trial about the twenty-two cases in which he had worked with the Chicago Police Department.[22] Nevertheless, challenges to the credibility and conflicting testimony of witnesses are largely left to the jury. We have no authority to overturn on appeal the jury's reasonable findings of fact on this matter. As noted above, Valentin's testimony was not internally inconsistent, implausible, or contradicted by extrinsic evidence. *See Contreras*, 820 F.3d at 263.

Moreover, after the jury's verdict, Mr. Caguana requested a new trial based on newly discovered evidence suggesting that Valentin perjured himself by misrepresenting his relationship with the Chicago Police Department. The district court found that Mr. Caguana's request raised a "substantial

---

[21] Reply Br. 4–5.

[22] *See* R.114 at 273; R.115 at 336–37.

issue" warranting further proceedings,[23] and we granted a limited remand.[24] Thereafter, the district court approved a post-trial investigation, authorized the appointment of a private investigator, allowed the issuance of subpoenas to obtain multiple documents and witnesses, and conducted a full evidentiary hearing on the matter. After extensive review, the court found that Valentin had not committed perjury and that a new trial was not warranted based on "merely impeaching or cumulative" new evidence.[25]

Mr. Caguana does not challenge the district court's denial of his motion for a new trial, so our assessment of his sufficiency challenge is based on the original evidence before the jury. *See, e.g.*, *United States v. Bender*, 539 F.3d 449, 453, 456 (7th Cir. 2008) (affirming denial of new trial based on purported new evidence and deciding sufficiency challenge based on original record). Nonetheless, we mention these post-trial proceedings insofar as they assure us that Mr. Caguana had an adequate opportunity to vet Valentin's relationship with the Chicago Police Department in support of his entrapment theory. Because the jury was entitled to credit Valentin, we cannot accept Mr. Caguana's argument that there was insufficient evidence for the factfinder to reject his entrapment defense.

---

[23] R.124.

[24] App. R.17.

[25] R.160 at 207; *see United States v. Bender*, 539 F.3d 449, 456 (7th Cir. 2008) (noting that cumulative impeachment evidence is generally insufficient to warrant a new trial).

## C.

We now turn to Mr. Caguana's contention that the district court erred in its interpretation of the Sentencing Guidelines and, consequently, imposed an unlawful sentence. The standards of review that govern our examination of this matter are well established. We review de novo a district court's interpretation of the Guidelines; we review its factual findings for clear error. The substantive reasonableness of a sentence is reviewed for abuse of discretion. *United States v. Grzegorczyk*, 800 F.3d 402, 405 (7th Cir. 2015). A sentence within a correctly calculated guidelines range is presumptively reasonable on appeal. *Id.*

Mr. Caguana argues that the district court misinterpreted the Guidelines and unlawfully "double counted" the element of the offense involving "the offer … of anything of pecuniary value for undertaking the murder." U.S.S.G. § 2A1.5(b)(1).

In determining Mr. Caguana's sentence, the district court first looked to § 2E1.4 of the Guidelines, because the statutory index pairs convictions under 18 U.S.C. § 1958 with the offense guideline in § 2E1.4. *See* U.S.S.G. Appendix A. This provision, titled "Use of Interstate Commerce Facilities in the Commission of Murder-For-Hire," directs the court to apply the greater base offense level of 32 or "the offense level applicable to the underlying unlawful conduct." U.S.S.G. § 2E1.4(a). Because Mr. Caguana's underlying unlawful conduct was solicitation to commit murder, the court looked to § 2A1.5, titled "Conspiracy or Solicitation to Commit Murder," which has a base offense level of 33.

Starting with the base offense level of 33, the court then applied a four-level enhancement under § 2A1.5(b)(1) because

"the offense involved the offer or the receipt of anything of pecuniary value for undertaking the murder." Lastly, the court added two more levels for obstruction of justice based on Mr. Caguana's false exculpatory testimony at trial. His final adjusted offense level was 39.

When paired with Mr. Caguana's criminal history of I, the final offense level produced a guideline range of 262–327 months. The court imposed a sentence of 210 months' imprisonment, composed of 105 months each for Counts 1 and 2 (to be served concurrently), followed by 105 months each for Counts 3 and 4 (to be served concurrently). Mr. Caguana also received one year of supervised release.

In the district court, Mr. Caguana challenged the four-level adjustment under § 2A1.5(b)(1). He argued that the base offense level of 33 already accounted for the underlying § 1958 offense, which has as one of its elements the intent that a murder be committed in exchange for "a promise or agreement to pay[] anything of pecuniary value." 18 U.S.C. § 1958(a). In his view, the additional enhancement—which was based on the fact that the offense "involved the offer … of anything of pecuniary value for undertaking the murder"—amounted to double counting.

The district court rejected this argument. It reasoned that "solicitation to commit murder" (the conduct underlying the base offense level in § 2A1.5) does not necessarily involve offering something of pecuniary value. For instance, the court suggested, one could solicit a murder as a favor.[26] Therefore,

---

[26] The district court also noted that without the § 2A1.5(b)(1) enhancement, the offense guideline under § 2A1.5(a) would result in a 168–210

the district court concluded that the enhancement for offering something of pecuniary value did not "double count" conduct already accounted for in the base offense level.[27]

Mr. Caguana now repeats the same double-counting argument, and like the district court, we cannot accept his contention. A plain reading of the Guidelines makes clear that there is no "double counting" here. The base offense level applies to any solicitation; the enhancement is added only in those cases where, as here, the solicitation is accomplished through an offer to pay something of value.[28]

We perceive no legal error or factual misapprehension in the district court's sentencing of Mr. Caguana. His sentence, below the guideline range, is clearly reasonable for the offenses of which he stands convicted.

---

guideline range, which still encompasses the Mr. Caguana's sentence. The court did not, however, explicitly state that it would have imposed the same sentence if the enhancement did not apply.

[27] We note that Mr. Caguana does not challenge the application of § 2A1.5 to determine his base offense level. He challenges only the enhancement under § 2A1.5(b)(1).

[28] We note parenthetically that in *United States v. Vizcarra*, 668 F.3d 516, 518 (7th Cir. 2012), we held that "the same conduct may determine the base offense level and also trigger the cumulative application of enhancements … unless a specific guideline instructs otherwise." There, the defendant claimed that applying an enhancement for kidnapping demanding a ransom was impermissible double counting because a ransom was an element of his kidnapping conviction. However, based on the guidelines commentary and history, as well as case law from our circuit and our sister circuits, we concluded that "cumulative application—that is, 'double counting'—is the default rule." *Id.* at 521.

## CONCLUSION

We hold that there is sufficient evidence to sustain Mr. Caguana's convictions, that the district court adequately instructed the jury on the defense of entrapment, and that the district court committed no error in the imposition of his sentence. Accordingly, the judgments of the district court are affirmed.

AFFIRMED